JOEL H. GOLDSTEIN AND ELAINE P. GOLDSTEIN,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 18699-84.      Filed September 14, 1987.

*Stanley L. Drexler, Benjamin Spitzer,* and *Kathryn A. Reeves,* for the petitioners.
*Michael J. Cooper,* for the respondent.

HAMBLEN, *Judge*: The Commissioner determined a deficiency in Federal income tax for petitioners' taxable year ended December 31, 1980, in the amount of $4,943, and an addition to tax for negligence pursuant to section 6653(a)[1] in the amount of $247. The issues this Court must decide are (1) whether petitioners made a charitable contribution to Temple Sinai during their 1980 taxable year and, if so, (2) what is the fair market value of the contribution.[2]

## FINDINGS OF FACT

Some of the facts of this case have been stipulated and are so found. Petitioners are husband and wife and resided

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year at issue, unless otherwise indicated.

[2]Respondent also disallowed a charitable contribution reported by petitioners of $1,235 to the National Council of Jewish Women. This item was not addressed by either party in the petition and answer or on brief. Therefore, we deem this issue to have been conceded by petitioners. Additionally, respondent increased petitioners' interest income by $67. Petitioners conceded this issue in their petition.

at Englewood, Colorado, at the time their petition in this case was filed.

Petitioners, neither of whom is an art dealer, were members of Temple Sinai, an exempt organization described in section 501(c)(3), and a church within the meaning of section 170(b)(1)(A)(i). Temple Sinai asked its members to contribute to two funds—an operating fund to finance the day-to-day costs of Temple Sinai, and a building fund to finance the mortgage on and any construction for the temple. In addition, members were also asked to contribute to a "Chai Fund," established by Temple Sinai in 1980 to finance emergency repairs to the temple building. Temple Sinai kept records of members' pledges and contributions each year. In 1980, petitioners pledged to contribute certain amounts, which they were obligated to pay, to each of the three funds.[3] Petitioners' pledge to the building fund in 1980 was $6,000. In December of 1980, petitioners attempted to satisfy their building fund pledge obligation, and if possible their pledge obligation to the Chai Fund, through the donation of certain property acquired through Noah Perlis (Perlis).

Perlis is the president and controlling shareholder of Sherwood International, Inc. (Sherwood). Sherwood is an art dealer in the business of purchasing and selling fine art prints and posters. Sherwood's sales of prints and posters to individuals who are not art dealers are for full value and do not contain a discount from this value.

In December of 1980, Sherwood acquired from Circle Fine Art Corp. (Circle) posters, colloliths, and collotypes for approximately $100,000.[4] Sherwood paid in cash within 30 to 60 days. Sherwood's purchase price was 16.67 percent of the retail price at which Circle sold the posters and other prints through its own galleries to the public.[5] Circle is the

---

[3]Though set timetables for payment were not established, it was understood that payment of pledges would be made by members "within a reasonable amount of time." Payment of a pledge did not always correspond to the year in which the pledge was made.

[4]Collotypes and colloliths refer to different methods or forms of printing using high-quality printing techniques for the reproduction of paintings or other fine art.

[5]Circle is one of the leading publishers and distributors of fine art and art-related products (see note 6 below) which it distributes at retail through its 24 galleries nationwide and at wholesale through approximately 1,800 dealers around the nation and in certain foreign countries. The retail price of posters, prints or other art purchased through a gallery reflects the cost to the gallery of overhead, which includes rent, advertising inventory and salaries, as

publisher of the posters and prints purchased by Sherwood.[6] The artists represented in the posters and prints are all well known, and include Norman Rockwell, Dimitrie Berea, and Erte. In addition, art from the Walt Disney Studios and six of a series of eight posters by well-known artists published by Circle in joint venture with the Metropolitan Opera Co. of New York were represented.

Perlis divided the posters and prints he acquired from Circle into 17 parcels each having approximately the same aggregate value.[7] The parcels contained prints or posters from each of the artists represented in the collection Sherwood acquired from Circle and were distinguished solely by the quantity of prints or posters of a given artist which were included in the respective parcels. Perlis then sold the parcels through Sherwood to the Goldsteins and to 16 other individuals during December of 1980. All of the transactions were identical. The purchasers paid Perlis 20 percent of the aggregate retail price of the respective parcels of posters and prints in cash and executed long-term promissory notes for the balance. In exchange, the purchasers received warehouse receipts identifying the posters and prints they purchased. Each of the 17 purchasers subsequently transferred his warehouse receipts to a designated charitable organization.

In addition to the 17 sales which Perlis arranged in 1980, he engaged in similar sales in succeeding years. In 1981, Perlis arranged 55 sales involving posters with a list price from Circle of $2.5 million. Of these 55 sales, all but 1 or 2 culminated in subsequent transfers to charitable organizations. In 1982, he arranged 20 to 25 sales with a list price totaling between $500,000 and $1 million. In 1983, he handled a dozen sales with an approximate $360,000 list price. In 1984, he handled 3 sales totaling less than $100,000 in list price.

well as a premium to reflect the reliability of a guaranty of authenticity of the reputation of a gallery such as Circle carries.

[6] A "publisher" of posters in the poster industry is one who acquires the copyright to the art reproduced and finances the reproduction of the art works. Circle is one of the leading publishers and distributors of posters and prints of fine art reproductions. Circle purchases or acquires the copyrights or licenses to reproduce art works through the artist himself, the artist's agent, or the owner of the copyright. Circle owns exclusive reproduction rights for most of the artworks it publishes and which were sold to Sherwood.

[7] Perlis determined the comparative value of the parcels by reference to the retail price at which Circle sold the prints and posters through its galleries.

With regard to the 42 posters included in the parcel the Goldsteins purchased, Perlis, through Sherwood, was on the average responsible for approximately 72 percent of the total retail sales of each poster in a period from 1980 to 1985. In this same time frame, Perlis was additionally responsible for more than 80 percent of the total retail sales of 26 of these 42 posters. Perlis' percentages of retail sales per poster are listed as follows:

| Artist name | Title | Sherwood's sales | Other retail sales | Total retail sales | Percent |
|---|---|---|---|---|---|
| Berea | Flower Terrace | 348 | 42 | 390 | 89 |
| Berea | Le Vase de Fleurs | 343 | 33 | 376 | 91 |
| Berea | Pont des Arts | 348 | 19 | 367 | 95 |
| Berea | Interieur Aux Fleurs | 418 | 19 | 437 | 96 |
| Berea | Door to the Garden | 343 | 24 | 367 | 93 |
| Berea | Large Window with Flowers | 268 | 21 | 289 | 93 |
| Rockwell | Outward Bound | 497 | 305 | 802 | 62 |
| Rockwell | Shuffelton's Barber Shop | 433 | 176 | 609 | 71 |
| Rockwell | Doctor and Doll | 744 | 292 | 1036 | 72 |
| Rockwell | Saying Grace | 820 | 131 | 951 | 86 |
| Rockwell | Golden Rule | 798 | 133 | 931 | 86 |
| Rockwell | Girl at Mirror | 1021 | 227 | 1248 | 82 |
| Rockwell | Freedom from Fear | 531 | 73 | 604 | 88 |
| Rockwell | Freedom from Want | 847 | 79 | 926 | 91 |
| Rockwell | Freedom of Speech | 528 | 81 | 609 | 87 |
| Rockwell | Freedom of Worship | 862 | 77 | 939 | 92 |
| Rockwell | Runaway | 1140 | 128 | 1268 | 90 |
| Rockwell | The Critic | 1135 | 52 | 1187 | 96 |
| Rockwell | Discovery | 880 | 81 | 961 | 92 |
| Rockwell | Saturday People | 401 | 28 | 429 | 93 |
| Rockwell | Moving People | 267 | NA | NA | NA |
| Rockwell | Dance Team | 271 | NA | NA | NA |
| Barbier | The Art of Dance | 338 | 204 | 542 | 62 |
| Bertschmann | I Love New York | 1327 | 261 | 1588 | 84 |
| Cocteau | 1977 Poster/Jack Gallery | 133 | 189 | 322 | 41 |
| Corning | Arlington House | 353 | 492 | 845 | 42 |
| Disney | Donald's Golf Game | 1638 | 632 | 2270 | 72 |
| Disney | Barnyard Olympics | 1636 | 226 | 1862 | 88 |
| Erte | Alphabet (w/text) | 738 | 2508 | 3246 | 23 |
| Erte | Alphabet (without text) | 232 | NA | NA | NA |
| Erte | Broadway's In Fashion | 435 | 683 | 1118 | 40 |
| Gallo | Carol | 495 | 428 | 923 | 54 |
| Kogelnik | Jack Gallery/1977 | 1332 | 61 | 1393 | 96 |
| Lockhart | 1977 America's Cup/ Off. P. | 1200 | 139 | 1339 | 90 |
| Loewy | Avanti | 340 | 325 | 665 | 51 |
| Vaura | Pegasus | 617 | 1605 | 2222 | 28 |
| Clave | Carmen | 1314 | 363 | 1677 | 78 |
| Linder | Der Rosenkavalier | 1269 | 125 | 1394 | 91 |

| Artist name | Title | Sherwood's sales | Other retail sales | Total retail sales | Percent |
|---|---|---|---|---|---|
| Marini | La Traviata | 1659 | 386 | 2045 | 81 |
| Masson | Don Giovanni | 1597 | 118 | 1715 | 93 |
| Rivers | Madama Butterfly | 1618 | 271 | 1889 | 86 |
| Wyeth | La Boheme | 1632 | 221 | 1853 | 88 |
| | | | Average percentage of total retail sales | | 872 |

Specifically, the Goldsteins' acquisition of the posters and prints was structured in the following manner. On December 27, 1980, Sherwood sold to the Goldsteins two negotiable warehouse receipts. Annexed to each of the receipts is a list of posters, collotypes, and colloliths of fine art (the posters).[9] Joel Goldstein (Goldstein) paid Sherwood $4,000 in cash[10] and executed on December 27, 1980, four long-term recourse promissory notes in favor of Sherwood, each in the principal amount of $4,000. Each of the notes calls for the payment of simple annual interest at 9 percent. The principal amount is due and payable on December 27, 1995. Pursuant to the terms of the notes, on December 27, 1980, Goldstein made a payment of $720 to Sherwood, representing prepayment of one-half of the first year's interest on the four notes.

Goldstein concurrently executed a power of attorney authorizing Perlis to make a charitable contribution of the warehouse receipts representing the posters acquired from Sherwood. Earlier that month, Goldstein had contacted the temple indicating he intended to contribute "art" to the temple. Goldstein instructed the temple to contact Perlis, who would handle the details of the intended donation. On December 31, 1980, four days after the Goldsteins had purchased the warehouse receipts, Perlis transferred the receipts to Temple Sinai for the Goldsteins by deed of gift.

---

[8]In determining the average percentage of retail sales, the Court made the assumption that the percentage amounts for posters for which percentages were unknown were zero.

[9]In the stipulation of facts, the parties agreed that two negotiable warehouse receipts—Nos. 9039 and 9040—were attached as joint Exhibits 2-B and 3-C. However, in examining those exhibits, the Court found that joint Exhibits 2-B and 3-C were duplicates of warehouse receipt No. 9040. Warehouse receipt No. 9040 contained an attached list of 430 posters. We shall assume for purposes of this opinion that unattached warehouse receipt No. 9039 also contained a list with a similar number of posters.

[10]Goldstein paid $2,000 in cash on Dec. 27, 1980, and the remaining $2,000 in cash on Feb. 15, 1981.

Pursuant to Perlis' request, the temple acknowledged receipt of the warehouse receipts and accepted the contribution on December 31, 1980. Temple Sinai formally acknowledged the contribution by letter dated January 20, 1981. The temple informed Goldstein it would liquidate the posters and record the proceeds received as a contribution payment against his and his wife's joint pledges. Goldstein requested that any such proceeds be credited first to their building fund pledge and the balance, if any, credited to their Chai Fund pledge.

The temple determined that its small size rendered it incapable of liquidating the posters in the retail market in a profitable manner. Therefore, it sought to liquidate the posters through Perlis, who had submitted several offers to. repurchase them during 1981. On December 24, 1981, Perlis, through Sherwood, repurchased from the temple the warehouse receipts representing the posters. Perlis' purchase included not only the warehouse receipts representing the posters contributed by the Goldsteins, but also warehouse receipts contributed to the temple by two other individuals in separate but identical transactions. Of the total purchase price of $47,500 offered by Perlis, $13,300 was paid in cash and $34,200 was financed by a promissory note executed by Perlis and payable in 10 equal annual installments without stated interest commencing in 1983. Upon receipt of the first payment from Perlis, Temple Sinai notified petitioners by letter dated January 14, 1982, that it had credited their Chai Fund pledge in the amount of $7,389.48.

On their joint Federal income tax return for their 1980 taxable year, petitioners reported a charitable contribution deduction of $20,000 for their donation of the warehouse receipts representing the posters to Temple Sinai.

## OPINION

Petitioners contend that they made a valid and completed gift of the posters to Temple Sinai in 1980 and that the fair market value of the contribution is $20,000. Respondent argues that petitioners did not make a completed gift of the posters in 1980. Instead, respondent contends the gift was not completed until 1981 because the transaction at issue was a single transaction encompassing not only the sale of

the posters to Temple Sinai in December of 1980, but also their repurchase by Sherwood in December of 1981. Respondent argues alternatively that, if a gift is deemed to have been made in 1980, its fair market value is much less than the $20,000 claimed by petitioners.

In determining the tax consequences which flow from a given transaction, we must look to the transaction's substance as opposed to its form. *Gregory v. Helvering*, 293 U.S. 465 (1935). This examination is required in the context of a charitable contribution, just as it is required in the context of other transactions. See *Dolese v. Commissioner*, 82 T.C. 830, 836 (1984), affd. 811 F.2d 543 (10th Cir. 1987); *Thriftimart, Inc. v. Commissioner*, 59 T.C. 598, 615 (1973). In the transaction at hand, petitioners structured their contribution to Temple Sinai through the form of a transfer of warehouse receipts. However, the true substance of their transfer was the property which underlay these receipts—the posters. Therefore, in addressing the issues raised in this case, we must direct our attention to this contribution's substance—the posters as represented by the warehouse receipts.

In general, section 170 allows as a deduction a charitable contribution made within the taxable year. A charitable contribution is a contribution or gift to or for the use of an organization described in section 170(c). Where property other than money is donated, the amount of the contribution is the fair market value of the property at the time the contribution is made. Sec. 1.170A-1(c), Income Tax Regs. The parties agree that Temple Sinai is an organization described in section 170(c). Therefore, the issues we must decide are whether a charitable contribution was in fact made by petitioners in 1980, and if so, what is the amount of the contribution.

A charitable contribution is synonymous with the term "gift," *Seed v. Commissioner*, 57 T.C. 265, 275 (1971); *DeJong v. Commissioner*, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962), which requires the ' following elements:

(1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and

control of the subject matter of the gift, *in praesenti*; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding the dominion of it; (6) acceptance of the gift by the donee; * * * [*Weil v. Commissioner*, 31 B.T.A. 899, 906 (1934), affd. 82 F.2d 561 (5th Cir. 1936), cert. denied 299 U.S. 552 (1936). Citations omitted. See also *Guest v. Commissioner*, 77 T.C. 9 (1981).]

In short, the essential elements of a gift are that there be donative intent, delivery by the donor, and acceptance by the donee.

Each of these requirements was satisfied in 1980. The Goldsteins, members of Temple Sinai, pledged $6,000 to the temple's building fund, as well as additional amounts to the temple's operating fund and Chai Fund. Petitioners acquired the posters with the intent of donating them to the temple to satisfy these pledges. Goldstein executed a power of attorney authorizing Perlis to donate the posters to the temple, which Perlis did. The warehouse receipts representing the posters were assigned to the temple by "Deed of Gift" which Temple Sinai received and accepted on December 31, 1980. We conclude on this basis that a valid gift was made by petitioners to Temple Sinai in 1980.

Respondent disputes that the Goldsteins' transfer of the warehouse receipts effectively transferred title to the posters to Temple Sinai. However, the warehouse receipts properly convey title to the receipts and to the goods identified therein pursuant to Colorado law. The warehouse receipts identify the location of the goods, are dated and numbered, and specify that the goods are to be delivered to the order of Sherwood. The warehouse receipts are properly executed by the bailee and notarized, and conform to the requirements of Colorado law. Colo. Rev. Stat. sec. 4-7-202 (1973). The warehouse receipts were properly negotiated and delivered by Sherwood to Goldstein and by Goldstein to Temple Sinai.[11] Colo. Rev. Stat. sec. 4-7-501 (1973). The holder of the warehouse receipts, Temple Sinai, duly acquired title to the posters identified by the warehouse

---

[11]Perlis negotiated the warehouse receipts to Temple Sinai as Goldstein's duly authorized attorney-in-fact.

receipts. Colo. Rev. Stat. sec. 4-7-502 (1973); *Skripak v. Commissioner*, 84 T.C. 285 (1985).

Respondent also argues that there was no completed transaction in 1980. Respondent contends that at the time the warehouse receipts were donated to the temple, it was agreed between Goldstein, Perlis, and Temple Sinai that after petitioners donated the posters to the temple, Perlis would repurchase them, the proceeds from that sale then being credited to petitioners' pledges to the temple. Respondent argues that therefore there was a single transaction which was not completed until Perlis repurchased the posters in December of 1981 and the temple credited petitioners' pledge account in January of 1982. We disagree.

The evidence in the record fails to establish that the elements of the transaction were prearranged. The temple considered various alternative means to liquidate most profitably the posters donated by petitioners. Though Goldstein knew that the temple would resell the posters to raise needed capital, the temple had made no commitment to sell the posters back to Perlis at the time petitioners donated the posters. Perlis made several offers to repurchase the posters during 1981, the last of which was accepted by the temple in December of that year. We do not believe the transaction pursuant to which Temple Sinai sold the posters back to Perlis was a prearranged part of the transaction in which Goldstein purchased the posters from Sherwood and donated them to the temple. The transactions involved were independent of each other. Accordingly, we reject respondent's argument that the transaction pursuant to which petitioners donated the posters to Temple Sinai was not completed until 1981.

Having concluded that petitioners made a valid charitable contribution in 1980 to a qualified donee described in section 170(c), we now turn to the question of the amount of the deduction to which petitioners are entitled. The deduction allowed is limited to the fair market value of the property donated as of the date of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having

reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. The price the donor paid for the property in an arm's-length transaction is highly probative of its fair market value. *Tripp v. Commissioner*, 337 F.2d 432 (7th Cir. 1964); *Chiu v. Commissioner*, 84 T.C. 722 (1985). This is especially true where, as here, the purchase by the donor is contemporaneous with his donation of the property. The determination of fair market value is a question of fact. *Skripak v. Commissioner, supra.*

Section 170 and the regulations promulgated thereunder are silent as to the market to be used in determining the fair market value of donated property. However, it has been determined that the valuation test for charitable contribution purposes is generally the same as that used for estate and gift tax purposes. *United States v. Parker*, 376 F.2d 402, 408 (5th Cir. 1967); *Anselmo v. Commissioner*, 80 T.C. 872, 881-884 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Section 20.2031-1(b), Estate Tax Regs., and section 25.2512-1, Gift Tax Regs., provide that the fair market value of an item of property is the sales price of the item in the market "in which such item is most commonly sold to the public."

The defining of this appropriate retail market is a question of fact (*Anselmo v. Commissioner*, 757 F.2d at 1213), and necessitates our identifying the ultimate consumer of the posters and prints involved in this case. *Lio v. Commissioner*, 85 T.C. 56, 68 (1985), affd. sub nom. *Orth v. Commissioner*, 813 F.2d 837 (7th Cir. 1987); *Skripak v. Commissioner*, 84 T.C. at 322; *Anselmo v. Commissioner*, 80 T.C. at 882-883. Having identified the ultimate consumer, we must then look to the amount this consumer would pay for the items in question on the contribution date to determine these items' fair market value.

Petitioners contend that the ultimate consumer in this case is a retail purchaser from Circle or from one of Circle's wholesale purchasers and would have us look to Circle's retail price list to determine the fair market value of the posters contributed to Temple Sinai. We disagree with petitioners' contention under the circumstances before us.

In *Lio*, we were asked to identify the ultimate consumer of certain lithographs. One set of taxpayers in that case,

Dr. and Mrs. Lio, purchased 150 unframed lithographs from Art Appraisers of America for $7,500 ($50 per lithograph). Nine months later they donated the lithographs to a charitable organization and claimed a charitable contribution deduction of $24,688 (or approximately $165 per lithograph). The other set of taxpayers in that case, Dr. and Mrs. Orth, purchased 100 unframed lithographs from Greenwich Art Consultants for $10,000 ($100 per lithograph). After having owned the lithographs for more than 12 months, they donated 73 of the lithographs to a number of charitable organizations and claimed a charitable contribution deduction of $27,682 (or approximately $379 per lithograph).

In defining the appropriate market and ultimate consumer for purposes of valuing the donated lithographs, we were asked by both sets of taxpayers in *Lio* to look to sales by art galleries and dealers to the general public. *Lio v. Commissioner*, 85 T.C. at 68. We did not do this. We instead declared that "the petitioners purchased the lithographs as individual customers" and that "The sales of the lithographs to the petitioners were as much sales to 'ultimate consumers' as the sales by art galleries and dealers to other individuals upon which the petitioners rely." *Lio v. Commissioner*, 85 T.C. at 69.

The consequences of this declaration were twofold. First, we defined the appropriate market as the market in which sales were made by the distributors with whom taxpayers in *Lio* dealt. *Lio v. Commissioner*, 85 T.C. at 70-71. Second, we looked to the amount paid by the *Lio* taxpayers in this market in valuing the contributed lithographs.[12] *Lio v. Commissioner*, 85 T.C. at 71.

In reaching this declaration in *Lio* and its attendant consequences, we noted the following important facts. First, the Lios and Orths did not purchase the lithographs for resale; they instead purchased the lithographs for their own use or for subsequent donation. *Lio v. Commissioner*, 85 T.C. at 68. Second, the Lios and Orths made bulk purchases of the lithographs in issue for which they received no

---

[12]In deciding to look to the purchase price paid by the *Lio* taxpayers, we noted that the evidence of value focused on a market in which there were few sales. *Lio v. Commissioner*, 85 T.C. 56, 71 (1985), affd. sub nom. *Orth v. Commissioner*, 813 F.2d 837 (7th Cir. 1987).

special discount in the purchase price. *Lio v. Commissioner*, 85 T.C. at 69, 71. And, third, the distributors from whom the Lios and Orths purchased their lithographs acted as art dealers and made substantial sales in the market of these particular lithographs. *Lio v. Commissioner*, 85 T.C. at 69, 70-71.[13]

Parallels for each of these facts are found in the instant case. The Goldsteins did not purchase the posters for resale. Instead, the Goldsteins' purchase was made in anticipation of the posters' subsequent contribution to Temple Sinai. Additionally, the Goldsteins received no special discount in price for the 860 posters represented in the warehouse receipts they purchased. Finally, total retail sales by Perlis, through Sherwood, of the particular prints and posters involved in this case represented a substantial portion of the total retail sales for these artworks.

This similarity in facts between the instant case and *Lio* leads us to the conclusion that the Goldsteins are indeed the ultimate consumers of the posters, and it is the market in which the Goldsteins were involved to which we must look to value the posters on the contribution date. See also *Skripak v. Commissioner*, 84 T.C. at 322. The appropriate retail market in this case was the market in which Perlis, through Sherwood, made bulk sales of prints and posters to customers who purchased their artwork, as represented by warehouse receipts, with small cash payments and large, long-term promissory notes, and who subsequently contributed such receipts to charitable organizations.[14] That such a defined market existed can be found in the fact that Perlis arranged approximately 70 such sales in a time frame covering 1980 and 1981.

Having established the appropriate retail market, we can now determine the value of the posters, as represented by

---

[13]In affirming our *Lio* decision, the Seventh Circuit in *Orth v. Commissioner, supra*, similarly noted these substantial sales and the bearing these sales had on the final determination of the contributed lithographs' value. *Orth v. Commissioner*, 813 F.2d at 842.

[14]In *Lio*, we opined,

"We do not construe the term *retail* * * * to mean that where a consumer has a choice of several sources for an item, only the most expensive source is a retail sale and all other sources are wholesale. Rather, the sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale * * *, and the most appropriate market for valuation purposes is the most active marketplace for the particular item involved. * * * [*Lio v. Commissioner*, 85 T.C. at 70; emphasis in original; citations omitted.]"

the warehouse receipts, on the contribution date. We note that neither petitioners nor respondent presented evidence on the value of posters and prints selling in this defined market. However, the error of the parties to this case in this respect does not necessitate our committing like error. We must determine the value of the posters based on all facts tied to this transaction.

We first note that the Goldsteins' purchase of the posters preceded by only 4 days the contribution of the same to Temple Sinai. Additionally, neither party to this case has presented evidence suggesting that any significant appreciation or depreciation in the value of the posters occurred in this defined market during this 4-day period. Evidence, however, has been presented from which we can conclude that the amount the Goldsteins paid for the posters does not reflect a special discount from the posters' actual value on the purchase date. Finally, nothing in the record leads us to a conclusion other than one which affirms the fact that the Goldsteins and Sherwood dealt at arm's length in their structuring of the posters' sale. Possessing this information, we can look to the price paid by petitioners for the posters as the true indicator of the posters' fair market value on the contribution date. *Tripp v. Commissioner, supra*; *Chiu v. Commissioner, supra*; *Lio v. Commissioner, supra*.

In this case, the stated purchase price to the Goldsteins for the posters was $20,000. However, the transaction was financed by the payment of $4,000 in cash, and the execution of four long-term recourse promissory notes, each in the principal amount of $4,000. One-half of the first year's interest, $720, was prepaid on December 27, 1980. The notes were executed on December 27, 1980; the principal is due and payable in 1995. Interest is payable at the simple annual rate of 9 percent.[15] Therefore, total payments due over the life of the four notes would be $16,000 principal and $21,600 interest, as of December 27, 1995.

---

[15]This rate exceeds the prescribed-test rate of interest for purposes of calculating total unstated interest within the meaning of sec. 483. Accordingly, no additional interest is imputed to the contract under sec. 483. See sec. 1.483-1(d)(1), (2), Income Tax Regs. Nevertheless, as discussed *infra*, the rate of interest stated was well below market rates. This disparity has a significant effect on the fair market value of the notes which is, in turn, determinative of the value exchanged for the posters.

We believe the present value of the purchase price to the Goldsteins represents the fair market value of the posters on the date petitioners donated the posters to the temple. However, we do not believe the stated purchase price of $20,000 accurately reflects the present value of the posters accorded by the parties to the transaction. Instead, the value of the posters as reflected in the transaction is the present discounted value of the notes as of the date of the transaction plus the $4,720 cash payment.[16]

The discount rate is the rate of interest applied at which the present value of the principal, invested at the rate for the term of the note, would yield the nominal value of the principal. For purposes of determining the present discounted value of the notes, we believe the appropriate bench mark rate is the prime lending rate.[17]

We take judicial notice of the fact that the prime lending rate on December 27, 1980, was 20.5 percent among many of the major banks. Citibank maintained its rate at 21.5 percent.[18] The present value of the principal amount of $16,000, payable in 1995 after a term of 15 years, is $810.40.[19] The present value of the Goldsteins' interest

[16]In *Lio*, we valued the purchased lithographs at "the actual prices paid by the [Lios and Orths] only a short period of time prior to the valuation dates." *Lio v. Commissioner*, 85 T.C. at 71. In the case at hand, the "actual price paid" is reflected in the $4,720 cash payment and the discounted value of the note. The $720 represents Goldstein's advance payment of one-half of the first year's interest on Dec. 27, 1980.

[17]The prime lending rate is the rate banks charge on their loans for which they bear the lowest risk, normally their most creditworthy customers.

Fair market value is determined as of the date the property was contributed. Therefore, we believe it is appropriate to apply the interest rates in effect as of the end of December 1980.

Petitioners have introduced no evidence that their standard of creditworthiness is equivalent to that of a commercial bank's most creditworthy customers. Therefore, we believe it is appropriate to apply an interest rate of 22 percent, which, in taking into consideration the Goldsteins' net worth and giving petitioners full benefit of the doubt, is only 1½ percent above the prime rate being charged by most banks in December 1980.

[18]See New York Times, Dec. 27, 1980, sec. 2, at 29, 35; New York Times, Jan. 3, 1981, sec. 1, at 1, and sec. 2, at 33.

[19]The present discounted value of the principal is calculated pursuant to the following formula:

$$PDV = \text{Principal} \times \frac{1}{(1 + i)^n}$$

PDV = present discounted value of the principal
i   = discount rate  = 22 percent
n   = term of years = 15

$$PDV = \$16,000 \times \frac{1}{(1.22)^{15}}$$
$$= \$16,000 \times .05065 = \$810.40$$

payments due on the notes is $4,816.33.[20] Therefore, the present value of the Goldsteins' notes executed on December 27, 1980, is $10,346.73: the sum of cash paid—$4,720— plus the present value of their notes—$5,626.73. This amount represents the fair market value of the posters. Petitioners' charitable contribution deduction for their contribution to Temple Sinai is therefore limited to $10,346.73.

Respondent argues that petitioners are liable for the addition to tax for negligence pursuant to section 6653(a). Respondent contends that petitioners have failed to establish they justifiably relied in good faith on competent tax counsel and have failed to substantiate their contribution pursuant to the requirements of section 1.170A-13(d)(1) and (2), Income Tax Regs.

---

[20]The present discounted value of the interest is calculated pursuant to the following formula:

$$PDV(I) = I \times \frac{1 - \frac{1}{(1+i)^n}}{i}$$

PDV(I) = present discounted value of the interest payments
I* = interest per period = $720 (years 1 through 3)
I** = interest per period = $1,440 (years 4 through 14)
I*** = interest per period = $2,880 (year 15)
i = discount rate = 22 percent
n = term of years

Pursuant to the notes executed by Goldstein, interest is paid annually at 9 percent simple interest. However, only one-half of the annual interest is due in years 1 through 3; full interest is due annually for the remaining years. The unpaid interest is paid the year the note is due, in the amount of $1,440 (since one-half of the first year's interest was prepaid, the only unpaid interest is one-half of the interest for years 2 and 3). Goldstein will thus pay $2,880 in year 15, the present value of which we may calculate by using the formula described in note 17. As Goldstein's interest payments will vary, we calculate each term separately as follows:

$$PDV(I^*) = \$720 \times \frac{1 - \frac{1}{(1.22)^3}}{.22}$$
$$= 720 \times 2.04224 = \underline{\$1,470.41}$$

$$PDV(I^{**}) = \left( \$1,440 \times \frac{1 - \frac{1}{(1.22)^{14}}}{.22} \right) - \left( \$1,440 \times \frac{1 - \frac{1}{(1.22)^3}}{.22} \right)$$
$$= (\$1,440 \times 4.26456) - (\$1,440 \times 2.04224)$$
$$= \underline{\$3,200.14}$$

$$PDV(I^{***}) = \$2,880 \times \frac{1}{(1.22)^{15}}$$
$$= 2,880 \times .05065 = \underline{\$145.88}$$

$$PDV(I^*) + PDV(I^{**}) + PDV(I^{***}) = \underline{\$4,816.33} \text{ (present value of all interest payments)}$$

See D. Thorndike, *supra* at 21.

Negligence, for purposes of section 6653(a), "is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967); see also *Neely v. Commissioner*, 85 T.C. 934, 947 (1985). Petitioners have substantially overstated their charitable contribution deduction, an action which we believe is highly probative of their negligence in this case. Petitioners have failed to demonstrate they relied in good faith on competent tax counsel apprised as to the relevant facts of their case. Compare *Nelson v. Commissioner*, 19 T.C. 575, 581 (1952).[21] Petitioners are well educated and should have been aware that the present value of their purchase price was far below the $20,000 claimed by them as the fair market value of the posters. Accordingly, the addition to tax for negligence pursuant to section 6653(a) was properly imposed by respondent.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[21]See also *Blake v. Commissioner*, T.C. Memo. 1981-579, affd. without discussion of this point 697 F.2d 473 (2d Cir. 1982).