ALLAN M. MOORE AND JOYCE MOORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moore v. Commissioner
Docket Nos. 13672-84; 13872-84.
United States Tax Court
T.C. Memo 1989-38; 1989 Tax Ct. Memo LEXIS 40; 56 T.C.M. (CCH) 1150; T.C.M. (RIA) 89038; January 24, 1989. Martin N. Gelfand, Dennis L. Perez and Bruce I. Hochman, for petitioners. Joyce L. Sugawara, Benjamin Duncan and Bruce Neuling (specially recognized), for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In notices of deficiency dated April 4, 1984, and March 6, 1984, respondent determined deficiencies in petitioners' income taxes for 1979 and 1980 of $ 17,350.17 and 32,430.80, respectively. [1] This case was selected as a test case in order to resolve issues common to a large group of taxpayers who, during 1979 and 1980, claimed research and development expense deductions through the partnership Automation Partners, Ltd. The issues for our consideration are: (1) Whether the research was undertaken with a profit objective or had economic substance consonant with the tax benefits claimed; (2) whether the expenditures were in connection with a trade or business; (3) whether the expenditures were substantiated; (4) whether petitioners' promissory notes are includable in the basis of their partnership interest; (5) whether petitioners' promissory notes constituted amounts at risk within the meaning of section 465; *43 and (6) whether petitioners are liable for additional interest on tax motivated transactions under section 6621(c), [2] I.R.C. 1986. FINDINGS OF FACT Petitioners, Allan M. and Joyce Moore, husband and wife, resided in Miami, Florida, when they filed their petition in this case. The stipulation of facts and attached exhibits are incorporated herein by this reference. Michael W. Phillips (Phillips) has been involved in various financial consulting activities since his graduation from the University of Miami with a Master's in Business Administration and Finance in 1969. Phillips served as a stockbroker and account executive with a major stock brokerage firm for approximately 8-1/2 years and then engaged in a variety of financial consulting activities for Capital Management Services, Inc. As a financial consultant, Phillips has advised *44 clients with regard to real estate, securities, and research and development investments. In the middle part of 1979, Phillips received information from Leonard Radomile (Radomile) relating to a research and development investment in a Canadian company named V-Mark Automation, Ltd. (V-Mark). V-Mark, for 10 or 15 years prior to 1979, had manufactured equipment to assemble ball point pens and felt tip markers. Since its formation, V-Mark had been a designer and manufacturer of automation machines, its most notable early product being the marker assembly machine first sold in 1969. The use of such machines resulted in pens being completely assembled and inked, checked, labeled, counted, aligned, and boxed ready for shipment at an extremely high speed, replacing manual assembly lines. As far back as 1971, V-Mark had already patented marker assembly machines intended for porous tip marker pens. Much of the research done by V-Mark in later years was to improve an already existing process. Each machine sold by V-Mark was individually designed for a specific customer. A memorandum from Radomile to Phillips dated August 6, 1979, initially described the research and development program. *45 Under the heading "Tax Aspects," on the first page of the memorandum, a three for one tax write-off was promised on cash contributions of $ 2.5 million by investors. Under the "Business Aspects" portion on the second page, Radomile described V-Mark as a good research and development company with good cash flow and a need for expansion capital. V-Mark would be able, ostensibly, to provide a "7% a year [cash return] on [investors'] investment, give them their money back in 10 years, amortize $ 5,000,000 in notes in 16 years, and provide an additional profit potential for the partnership." These "decent economics" would legitimize the "multiple write-off deal." Prior to becoming involved in the research and development program, Phillips visited the V-Mark manufacturing plant in Montreal, Canada. Phillips was accompanied by one of his attorneys and another financial consultant. During his visit, Phillips spoke to V-Mark owners, Lou Zabludowski and Ed Klein. Phillips met with the principals of the company, spoke with the workers and toured and inspected the premises. Phillips relied on his attorneys to structure and finalize the resulting transaction. Automation Partners, *46 Ltd. (APL or partnership), a limited partnership formed under the laws of the State of Florida, was the vehicle used for the research investment. Phillips was the general partner of APL. APL did not anticipate that it would engage in the manufacturing and marketing of automated assembly machines. APL did not hire any engineers, scientists or employees with marketing experience. Phillips has no engineering or scientific background. APL prepared a Private Placement Memorandum (prospectus) that was distributed to potential limited partners. After a brief opening paragraph, the prospectus stated: "The Partnership seeks to provide each Limited Partner tax deductions in 1979 and 1980 equal to $ 2.98 for each $ 1.00 of cash contributed * * *, the conversion of ordinary income into capital gain, and the potential return of the investors' cash contributions." The prospectus contained a 35-page tax opinion. It did not contain any independent valuation of the research conducted, or any estimates or projections of APL's expected revenues, or of gross sales of V-Mark's products. The prospectus did contain a description of the research program, the details of which are discussed below. *47 On December 28, 1979, Phillips executed a Research and Development Agreement (Research Agreement) on behalf of APL with Viscount Industries, A.G. (Viscount), [3] a Liechtenstein corporation. Although the original intention was apparently to contract directly with V-Mark, V-Mark required (for reasons not discernible in the record) that Viscount be used as an intermediary between APL and V-Mark. Pursuant to the Research Agreement, APL was to pay Viscount $ 7,450,000 to do research on its behalf. Installments of $ 1,200,000 and $ 1,250,000 were payable in December 1979 and April 1980, respectively. APL issued a $ 5,000,000 non-interest-bearing promissory note due December 31, 1996, for the remainder. The research program was to last for 10 years, with the purchase price allocable as follows: High Speed Indexer
$ 800,000
In-Line Transfer Device
350,000
In-Line Assembly
400,000
High Speed Orientation Device
500,000
High Speed Pallet Transfer System
250,000
Modular Pretesting System
400,000
Total research
$ 2,700,000
Plant and equipment
2,300,000
5,000,000
Additional "task plans"
2,450,000
Total
$ 7,450,000
*48 These estimated allocations for each device were based on a number of projected man-hours times $ 100 per man-hour. APL was to own all property rights in every item of technology developed. The results of the research program were collectively referred to as technology, while each separate result was referred to as an item of technology, i.e., high speed indexer was an item of technology. Viscount was an "independent contractor," with sole and exclusive control over personnel and operation, with APL having an interest in the result only. Viscount then entered into an agreement (Viscount Agreement) with V-Mark to satisfy its obligations under the Research Agreement. The Viscount Agreement commenced in February 1980 and was to last for 10 years. In most respects, the Viscount Agreement was similar to the Research Agreement; V-Mark was to undertake research on behalf of Viscount and Viscount would own any resulting property rights. However, the price for the research was considerably less than that under the Research Agreement. Viscount agreed to pay a "minimum fee" in Canadian Dollars (Can$ ) of Can$ 790,375, payable Can$ 34,375 on August 31, 1980, and nine equal annual *49 installments of Can$ 84,000 commencing August 31, 1981. An additional purchase price, based upon certain listed criteria, was to be negotiated. If the parties failed to negotiate a further purchase price, the Can$ 790,375 was deemed the entire price. Viscount and V-Mark also entered into a royalty agreement (Royalty Agreement). Under such agreement, V-Mark was given an option to acquire, for one dollar, the license to use an item of technology. This option was for a 15-month period commencing 10 days after V-Mark gave notice to Viscount that research on an item was complete. V-Mark agreed to pay a royalty equal to 5 percent of gross sales of products sold utilizing the item of technology. Viscount and APL also entered into a Technology Transfer Agreement (TTA), similar in some respects to the Royalty Agreement. Within 120 days of the issuance of a report concerning an item of technology (issued upon completion of research on the item), Viscount was given an option to acquire an exclusive license for such item of technology. Viscount agreed to pay APL $ 175,000 in exchange for the option. If Viscount exercised its option, it was required to pay royalties equal to 5 percent *50 of gross sales (2 percent after 16 years) of products utilizing the technology, or a minimum annual royalty (without regard to gross sales) as follows: Years 1-5
$ 375,000
Years 6-10
475,000
Years 11-15
575,000
Years 16
675,000
Years 17 and thereafter
175,000
Any royalty in excess of the minimum would reduce the minimum royalty due for the succeeding year. Viscount could terminate its obligation to pay royalties by paying APL $ 2,500,000 plus 65 percent of the minimum annual royalties not yet paid. Viscount could, in its sole discretion, offset royalties owed against indebtedness of the partnership, i.e., the $ 5,000,000 promissory note. The prospectus anticipated cash flow of $ 175,000 per year to APL from the minimum royalty, the remainder being used to amortize the $ 5,000,000 note to Viscount. Under such a scenario, the note would be fully amortized in year 16. [4]
At the time the partnership units in *51 APL were offered, it was expected that Viscount would lend V-Mark Can$ 1,500,000. The loan, to be made in 1980, was subordinated and unsecured. The loan bore interest at 19.5 percent through September 1, 1989, and at 14 percent thereafter. Interest only payments were required through 1989. Commencing August 31, 1990, principal was to be paid in six annual installments of Can$ 250,000, along with accrued interest. On December 28, 1979, petitioner [5] Allan Moore purchased a limited partnership interest in APL for $ 30,000, and executed a partnership subscription agreement. The $ 30,000 was payable as follows: (1) $ 5,000 initial contribution; (2) $ 20,000 recourse promissory note; and (3) $ 5,000 recourse promissory note. The $ 5,000 note bore interest at 8 percent and was due on March 15, 1980. Petitioner paid $ 5,086 on March 21, 1980, to retire the note. The $ 20,000 note was due on December 31, 1996, and did not bear interest. This note was to be reduced pro rata as the $ 5,000,000 note from APL to Viscount was reduced. Petitioner signed a power of attorney designating Phillips to *52 act as his agent with regard to partnership matters. Petitioner also executed an assumption agreement, whereby he agreed to assume his pro rata share of the $ 5,000,000 partnership debt. The partnership was fully subscribed in 1979, with $ 7,450,000 in cash and short and long-term notes like those signed by petitioner. Phillips received at least $ 200,000 from Viscount in syndication fees, and was entitled to receive $ 499,500. Phillips engaged in a variety of activities as general partner of the partnership. He maintained the books and records of the partnership using the accrual method of accounting. Phillips met with the principals of V-Mark in early 1980 in Miami to discuss the research activities conducted by V-Mark on behalf of the partnership and to find out about the financial condition of V-Mark. He was in frequent contact with V-Mark in 1980 and 1981. Phillips reasonably relied on information received from V-Mark and Viscount that the research was being performed, including detailed annual reports sent by V-Mark on Phillips' request. Phillips reported V-Mark's progress to the limited partners, typically on an annual basis and included partnership income distributions. *53 During 1979 and 1980, Viscount did not exercise any options with respect to items of technology produced under the research program conducted on behalf of the partnership. No item of technology was ever released from the research program. Viscount exercised its option in 1981 under the TTA, even though no item of technology was ever released. The minimum royalty payments were credited against the $ 5,000,000 note so that Phillips could report in 1984 that the balance had been reduced to $ 4,600,000. According to its annual reports, V-Mark had the following gross sales, ostensibly in Canadian dollars, for the periods noted: 1978
$ 1,439,525
1979 (6 months)
570,533
1980 (9-1/2 months)
1,052,493
1981
1,431,797
1982
1,449,984
On its return for 1979, APL reported interest income of $ 1,157, deductions for research and development of $ 7,450,000, and accounting fees of $ 1,000. APL reported a net loss of $ 7,449,843 in 1979. Petitioners deducted their distributive share of such loss, to the extent of their claimed adjusted basis in their partnership interest, or $ 25,000. On their 1980 return, petitioners deducted a $ 4,539 loss from APL. OPINION *54 Section 174(a)(1) allows a deduction, in lieu of what normally would be a capital charge, for "research or experimental expenditures which are paid or incurred by * * * [a taxpayer] during the taxable year in connection with his trade or business * * *." The regulations also allow a deduction for expenditures incurred for research undertaken by another party on the taxpayer's behalf. Sec. 1.174-2(a)(2), Income Tax Regs. As a threshold issue, petitioners must establish that the expenditures were in connection with a trade or business. The existence of a profit objective is crucial to a determination that an enterprise is a trade or business. Sec. 183; Soriano v. Commissioner,90 T.C. 44 (1988); Green v. Commissioner,83 T.C. 667, 687 (1984). Similarly, a transaction will be disregarded if it is devoid of economic substance consonant with its intended tax effects. James v. Commissioner,87 T.C. 905 (1986). *55 Using an integrated approach to resolve these related inquiries, we must "separate the real economic aspects from the 'financial fantasies' surrounding a transaction." Rose v. Commissioner,88 T.C. 386, 414 (1987). The Rose approach is applicable to "generic tax shelters." We think it is proper to characterize the research program at issue as a generic tax shelter. Tax benefits were the focus of the promotional materials. The most prominent feature of the program was the three for one tax write-off. It was mentioned prominently in the first substantive sentence of the prospectus. Moreover, that same sentence promised only a "potential" return of cash invested. In addition, there is great difficulty in valuing technology that has yet to be perfected (or even invented), for which there may not be a potential market. Finally, approximately two-thirds of the purchase price was deferred using a non-interest-bearing promissory note, which, as will be discussed, was effectively nonrecourse. Thus, the research program is a "generic tax shelter," and the Rose analysis applies. Rose v. Commissioner, supra.
In a typical abusive shelter, there *56 is a purported transfer of ownership at greatly inflated prices financed by nonrecourse debt. Because the fair market value of the underlying asset could not conceivably support the purchase price, there is considerable doubt whether economic profit could have been the primary objective. Thus, generally, we have focused on the relationship of price to fair market value and the recourse or nonrecourse character of the debt in evaluating profit objective or economic substance. Soriano v. Commissioner, supra;Rose v. Commissioner, supra;Beck v. Commissioner,85 T.C. 557 (1985). We must first evaluate the fair market value and profit potential of the package of rights "sold" to APL. Petitioners argue, and respondent disputes, that the Research Agreement was worth the $ 7,450,000 purportedly paid by the partnership. We agree with respondent. Petitioners rely on the testimony and report of their expert, Richard Wise. Mr. Wise used the cost-to-create method to value the partnership's research and development program. This method attempts to arrive at the cost to duplicate the particular program without emphasis on future profits or cash *57 flows. Under this approach, Mr. Wise compared the actual man-hours spent on task plans to the proposed hours and concluded they were reasonable. He then, theoretically, multiplied the hours by 50 percent, to reflect hours spent only on research and development. These hours were then multiplied by an hourly rate, starting at $ 100 per hour for 1980 and increasing to $ 135 per hour for 1983. Ten percent of this total was added, as the cost for materials. Mr. Wise arrived at a value of between $ 7,225,000 and $ 7,675,000 for the rights acquired by APL. We are free to reject expert testimony if it is contrary to our own judgment. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). We give no weight to petitioners' expert's report because it contains too many unverified assumptions and other flaws. First, there is no independent basis for the assumption that 50 percent of all man-hours was related to research and development. Petitioners' expert apparently accepted this figure from V-Mark. This 50-percent figure was not even consistently applied, and the variation could not be explained by Mr. *58 Wise at trial. The same holds true with respect to the 10-percent materials assumption, and the cost per man-hour. While $ 30 per hour [6] may have been appropriate for "Engineering and Scientific Services," we do not know the skill level or educational requirement behind this figure. For example, we know that no V-Mark employees had engineering degrees, but we do not know whether employees in "Engineering and Scientific Services" had such degrees. Moreover, in comparing actual to projected man hours, Mr. Wise included hours completed before the agreements were signed. Finally, the hours shown on the time sheets do not correspond with the often inflated hours shown on the expert report. Contrary to petitioners' expert, we believe there is enough information to judge fair market value, and profitability, from future cash flows and other indicia. Profit means economic profit, independent of tax savings. Herrick v. Commissioner,85 T.C. 237 (1985); Surloff v. Commissioner,81 T.C. 210 (1983). Using anticipated royalties from the TTA, we can evaluate the profit *59 potential of the APL program. Preliminarily, we believe that exercise of the license options, triggering the TTA royalties, was either predetermined or inevitable. If any item of technology seemed promising enough to market successfully, V-Mark, and consequently, Viscount, would exercise its option and obtain an exclusive license. Otherwise, V-Mark would not be able to develop, manufacture or sell its own products, since Viscount and, ultimately, APL, owned the property rights to the technology. On the other side of the transaction, APL depended upon the expertise of V-Mark to profit from the assembly machine business. Phillips did not have any engineering or scientific background, or any background in the marketing of assembly machines. Therefore, any rights obtained under the Research Agreement would be virtually worthless without the aid of V-Mark. In addition, V-Mark could exercise its option for one dollar, forcing Viscount to exercise its option. Finally, Viscount exercised its option in 1981, even though no item of technology was ever released. Thus, we must conclude that exercise of the option was prearranged or a foregone conclusion. In light of this, any future cash *60 flow or profit was dependent on the royalty provisions of the TTA. After exercise of the option, APL was entitled to either 5 percent of gross sales or a minimum royalty according to a schedule. From an objective standpoint, the greatest amount of royalties APL could expect to receive was the minimum royalties under the TTA. For example, the minimum royalty for years one through five was $ 375,000. Gross sales for items of technology covered by the Research Agreement would have to exceed $ 7,500,000 [7] to surpass the minimum royalty. Petitioners have failed to prove that V-Mark's gross sales could even come close to that figure. Royalties only had to be paid on gross sales attributable to items of technology developed for the partnership. From 1977 through 1982, V-Mark's total sales on all its products did not even exceed $ 1,500,000 (ostensibly Can$ ). It is beyond reasonable speculation to expect sales of five times that amount. According to the prospectus, *61 minimum royalties would be applied against the $ 5,000,000 note, except for $ 175,000 cash each year to be distributed to APL. APL could expect cash flow of $ 175,000 per year for 17 years, commencing in 1982, under the minimum royalty provision. The note would be fully amortized over that period. In addition, at the execution of the TTA agreement, Viscount paid $ 175,000 for the option. Over 19 years, this would yield an absolute maximum value of $ 3,150,000, less than half (42 percent) of the $ 7,450,000 purchase price. In other words, on a $ 2,450,000 investment, over 19 years APL could expect an average economic return of 1.5 percent per year. There are additional indicia that the fair market value of the research program did not even approach its purchase price. We may value the research program by the value of what was given in exchange therefor. In Goldstein v. Commissioner,89 T.C. 535 (1987), we valued posters by valuing the cash and notes given by the purchasers. The notes, which bore interest at below-market rates, were discounted to present value using the prime rate of interest. Here, APL paid $ 2,450,000 and a $ 5,000,000 16-year non-interest-bearing *62 promissory note. In this case, we believe 12 percent to be an appropriate minimum discount rate -- investors were able to borrow from APL on a short term basis at an 8 percent rate, while V-Mark was able to borrow from Viscount for a long term at a rate of 19.4 percent. The present value of a non-interest-bearing $ 5,000,000 note for 16 years at 12 percent is approximately $ 815,000. When added to the initial cash outlay, this comes to a total value for the research program of $ 3,265,000 under the Goldstein approach. This is still less than half of the purported purchase price. Finally, Viscount agreed to pay V-Mark approximately Can$ 790,000 for the same research that it sold to APL for over $ 7,000,000. Petitioners make much of the fact that additional amounts were to be negotiated later. However, if the parties failed to timely negotiate a further purchase price, the Can$ 790,000 was deemed the entire price. Moreover, even if we allow for a profit to Viscount, it is difficult to imagine additional amounts approaching the magnitude of the claimed purchase price. We therefore find, under several valuation approaches, that the fair market value of the research program *63 was not within a reasonable range of the purchase price, and that the transaction was not economically viable. In addition, as previously indicated, the exercise of the options was inevitable. Although petitioners strenuously contend that the option had real economic significance, we find it highly probative that Viscount exercised the option even though no item of technology was ever released from the program. Thus, payment of the $ 5,000,000 "recourse" note, without any additional investment by petitioners, was virtually assured. Petitioners were effectively immunized from loss in connection with the note. The financing in this case is analogous to cases involving nonrecourse financing, because the effect is the same, protection against real economic loss. See Rose v. Commissioner, supra;Beck v. Commissioner, supra.
Other aspects of this transaction reveal it as primarily tax motivated. Neither Phillips, nor petitioners, obtained any independent appraisals, revenue estimates or sales projections. Soriano v. Commissioner,90 T.C. 44 (1988); Beck v. Commissioner,85 T.C. 557 (1985); Flowers v. Commissioner,80 T.C. 914 (1983). *64 In addition, the promotional materials clearly emphasized the three to one tax write-off. Therefore, we find that this transaction lacked both economic substance and profit objective. This research program appears to be just another instance of trading tax deductions for an infusion of capital. As structured, this transaction could generate no more than tax deductions and a miniscule return for investors. At the outset, the $ 2,450,000 Viscount received from APL was almost sufficient to pay the minimum royalties, purchase the research from V-Mark, loan V-Mark Can$ 1,500,000, and pay Phillips' syndication fees. [8] Therefore, everyone involved could be content, without financial risk, and business could go on at V-Mark as usual. *65 There are other reasons the claimed deductions would fail. Engaging in a trade or business comprehends considerable, continuous and regular activity, apart from passive investment. Higgins v. Commissioner,312 U.S. 212 (1941). No deduction is allowable under section 174 for research if no control is retained over the manufacture or marketing of the resulting technology, because it does not rise to the level of a trade or business. Levin v. Commissioner,87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987); Green v. Commissioner,83 T.C. 667 (1984). APL did not have personnel experienced in engineering, nor could it manufacture or market assembly machines. APL had no control over the way the research was done -- its interest was limited to the result only. Further, APL's contract was with Viscount, not V-Mark, the entity doing the actual research. Phillips' activities on behalf of APL were basically ministerial in nature. Therefore, the research was not done in connection with a trade or business of APL, it was passive *66 investment. Levin v. Commissioner, supra;Green v. Commissioner, supra.
Further, we have some doubt about the level or extent that actual research or development was being undertaken. V-Mark was producing assembly machines for existing customers. Any research only effected improvements to already existing processes. Therefore, we doubt that 50 percent of the man-hours spent on any item was on research and development. We question whether petitioners have substantiated that research and development was in fact taking place, at least to the extent indicated by the purchase price, or that research was being conducted in the experimental or laboratory sense. Section 465 limits losses to the amount a taxpayer has at-risk in an activity. Sec. 465(a). An individual is at-risk for borrowed amounts only to the extent he is personally liable for such amounts. Sec. 465(b)(2)(A). *67 In addition, a taxpayer is not considered at-risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements or other similar arrangements. Sec. 465(b)(4). The minimum royalty provision was such a device, intended to ensure that investors never had to pay the $ 5,000,000 note, and correspondingly, the individual notes they gave to the partnership. "[T]he[a]mounts were obviously designed to protect investors from ever being required to satisfy the 'loans'." Capek v. Commissioner,86 T.C. 14, 50 (1986). Petitioners strenuously argue that the option was not exercised under a prearranged plan. However, we are at a loss to explain why Viscount exercised its option, triggering the minimum royalties, when no item of technology was ever released from the research program. Under these circumstances, both the option and the $ 5,000,000 note were illusory. Thus, petitioners were not at-risk with respect to the $ 20,000 note, or their assumption of the $ 5,000,000 note. The final issue is the additional interest imposed on tax motivated transactions by section 6621(c). [9] *68 The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax motivated transaction includes any valuation overstatement (as defined in section 6659) and any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(i), (v). We have defined sham or fraudulent transaction to include transactions where the taxpayer lacked profit motive and which were without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987); affd. without published opinion sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), and Skeen v. Commissioner,    F.2d    (9th Cir. 1989). In addition, the Commissioner has the authority to specify types of transactions that will be treated as tax motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included as tax motivated transactions *69 in respondent's temporary regulations. Sec. 301.6621-2T Q-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). We have previously disallowed the losses related to the research program because it lacked economic substance and the requisite profit objective. Thus, the increased rate of interest applies to these items. Rose v. Commissioner,88 T.C. at 424-427. Soriano v. Commissioner,90 T.C. 44 (1988); Cherin v. Commissioner,89 T.C. 986 (1987); Patin v. Commissioner, supra.
To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. The two cases (1979 and 1980) were consolidated for purposes of trial, briefing and opinion. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Viscount and Viconte Industries, A.G., in whose name some of the documentation appears, are the same entity.↩
4. ↩
Years 1-5
(375,000-175,000)
x 5 =
1,000,000
Years 6-10
(475,000-175,000)
x 5 =
1,500,000
Years 11-15
(575,000-175,000)
x 5 =
2,000,000
Year 16
(675,000-175,000)
x 1 =
500,000
Total
5,000,000
5. Petitioner, when used in the singular, refers only to petitioner Allan M. Moore.↩
6. This number was multiplied by 3-1/3 to take into account overhead and profit.↩
7. Five percent of $ 7,500,000 equals $ 375,000. We also note that this sales figure would be in American dollars, which would be worth more than the Canadian denominated sales figures reflected in V-Mark's reports.↩
8. The present value of an obligation to pay $ 175,000 per year for 16 years (the minimum royalties) is $ 1,220,000. Can$ 1,500,000 (loan to V-Mark), at a 70-percent exchange rate, equals $ 1,000,000. The present value of Can$ 84,000 per year for 9 years, plus Can$ 34,000 (cost of research from V-Mark), also converted at 70 percent, is $ 337,000. Phillips testified he received $ 200,000. This totals $ 2,757,000, of which investors had already contributed approximately 89 percent. An even greater percentage (96 percent) results if a 15 rather than a 12-percent discount rate is used. In this regard Viscount was earning 19.4 percent on its loan to V-Mark, which it could use to pay minimum royalties.↩
9. Prior to the Tax Reform Act of 1986 subsec. (c) was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies after Dec. 31, 1984, and notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986).