EDWARD CARR, *Ex. vs.* LYDIA GERTRUDE MACDONALD *et al.*

APRIL 3, 1944.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.   This bill in equity is brought by the executor of the will of Clara Ethel Rocheford, late of the city of Woonsocket, deceased, to set aside the transfer of three savings accounts purporting to have been made by her to the respondent Lydia Gertrude MacDonald on November 17, 1941. After hearing on bill, answer, replication and proof, a final decree was entered in the superior court granting the prayer of the bill. The cause is before us on respondents' appeal from that decree.

The testatrix, who was seventy-two years old and a widow, died in the Woonsocket Hospital on November 19, 1941. The respondent Lydia Gertrude MacDonald, of Milton, Massachusetts, who calls herself Gertrude MacDonald and will be so called by us hereinafter, is the only child of the testatrix.   In 1918 she married Bradbury MacDonald, who is also a respondent in this cause.   The third and last re-

spondent is the Old Colony Cooperative Bank, one of the three banks in which the testatrix had a savings account. Since Gertrude MacDonald is the principal respondent, the term respondent will hereinafter refer to her unless otherwise indicated.

It appears in evidence that the complainant is a lawyer who had practiced his profession in Boston, Massachusetts, for forty years. The respondent recommended him to her mother when she wanted to make a will. He drafted and the testatrix executed two wills, the first on April 17, 1937, and the second on September 13, 1938. Except for certain changes not material here, the provisions in both wills affecting the respondent and her husband are identical.

The 1938 will was offered for probate with the assent of the respondent and was thereafter duly allowed by decree of the probate court. No appeal having been taken from such decree, this will now stands as the true and valid will of the testatrix. After providing for the payment of debts, the testatrix gives all the rest and residue of her estate, "both real and personal" to the complainant in trust for the respondent, "to pay to her the net income thereof every three months and in addition thereto to pay her such amounts at such times as my trustee deems necessary for her sole confortable maintenance and support, but in no event is any part of my estate paid to my said daughter to be used by her in the support of her husband, Bradbury MacDonald, of said Milton or expended on him for any purpose. If my daughter survives her said husband, then my trustee is instructed to pay over to her the unexpended balance of said trust fund. Should my daughter die before her said husband and there is any part of said trust fund unexpended, I direct my trustee to pay such balance to my beloved sister, Nellie Castle, and my beloved brother, Joseph Hare, both of Croydon, England, in equal parts." The will further provides that Carr, who is the executor and trustee therein named, shall furnish a surety company bond in each instance.

Complainant testified that when he received instructions from testatrix concerning the provisions of her will, she also told him why she did not want her daughter's husband to receive any benefit, directly or indirectly, from her estate, and that he then noted what she said in his diary, which he produced and used in the course of his examination at the trial of this cause. His testimony as to certain facts on this point was supported by other and independent evidence. All we need to say now concerning this matter is that it referred to the behavior of respondent's husband about the time of his marriage to her in 1918.

For the last four years of testatrix's life, respondent and her husband made week-end visits to the testatrix, who lived alone in Woonsocket. On the evening of November 14, 1941, the testatrix, who had been suffering from diabetes for over seven years, fell to the floor of her kitchen and, being unable to move, remained there until her plight was discovered by neighbors the next morning. They first summoned the police and then notified the respondent. The police surgeon, Dr. Edward L. Myers, who came in response to the police call, found no serious visible injury to the testatrix, but upon learning from her that she was diabetic, he advised her to go to a hospital. Her answer was that she would discuss the matter with her daughter, who was coming that afternoon, whereupon the doctor promised to come back later in the day. When he returned, he was informed by the testatrix, in the presence of the respondent and her husband, that she had decided to go to the hospital. The matter of the bankbooks now under consideration originated in the course of this conversation. The testatrix died at the hospital four days later.

What occurred during these four days is the subject of much conflicting and often contradictory testimony, only the substance of which we will attempt to state. We note here that unless otherwise specified Dr. Myers, the respondent and the respondent's husband were present at all the conversations with the testatrix to which we refer. To avoid

confusion, we will first state the testimony in reference to the alleged gift of the bankbooks and then set forth the testimony respecting testatrix's physical and mental conditions.

Doctor Myers testified that before the testatrix was sent to the hospital he asked her if her affairs were in order and that she replied affirmatively, saying that she had made a will. She then also told him that she had some bankbooks which "she wished to give to her daughter", whereupon he informed her that it was "not as simple as all that"; that she would have to go through the "necessary procedure", and that she replied: "I realize that, that can be taken care of the first of the week." He further testified that as he was leaving the house, the testatrix was "then directing her daughter, pointing to the room where she could find those bank books."

On this point, respondent testified that her mother spoke to Dr. Myers as follows: " 'I have some bank books and some money I want to give my daughter.' He said, 'Oh, you have some bank books you want to give the daughter and you want to give her the money?' She says, 'They are in the top drawer in the blue room.' Dr. Myers says, 'You can't do it, anything as easy as that. You can't just give your daughter this money. You have to sign some forms.' My mother says, 'All right, will you take care of it?' ", which remark, according to the respondent, was addressed to both Dr. Myers and herself.

The next incident in connection with the bankbooks took place at the hospital on Monday morning, November 17. Doctor Myers testified that, after examining the testatrix, the conversation turned to the matter of the bankbooks; that the respondent had with her the necessary bank forms to effect a transfer of those books; that, addressing the testatrix, he asked her "if it was her intention to give the bank books and the contents thereof to her daughter", and that she said "Yes"; that after the bank forms, which were already filled out, were read to the testatrix, she signed

them by mark, as he advised her that "making her cross would be just as good as making her signature, because she had to go through the operation three different times"; and that he and a nurse then signed as witnesses. Each form that the testatrix so signed directed that the name of the respondent be added to the particular account, thus putting the title of the account in Mrs. Ethel Rocheford or Mrs. Gertrude MacDonald, payable to either or to the survivor.

In cross-examination it appears that Dr. Myers had also testified in this cause when the matter of a preliminary injunction was before the superior court. He then first unequivocally testified that he had read the bank forms which the testatrix signed and that he was absolutely sure that all three forms directed that the accounts therein identified be transferred in the name of the respondent alone. Later in his examination at that time he testified that he would be "very much surprised" to learn that each transfer was made out in the joint names of the testatrix and her daughter, payable to either or to the survivor. Confronted with this testimony at the hearing on the merits of this cause his explanation was that whether the transfer of the bankbooks was made in the name of the daughter alone, or in the joint names of the testatrix and her daughter was "not of such great importance", and finally admitted that his memory was "faulty" at the *earlier* hearing.

We also find a substantial variance in his testimony as to how the respondent came to secure the bank forms involved in this cause. In the hearing on the merits he testified that he visited the testatrix only once on Monday morning and that the respondent already had the bank forms in her possession at that time. In the earlier hearing he testified that he visited the testatrix twice on that morning; that when the testatrix spoke to him about the transfer of the bankbooks, he told "her daughter that it would be necessary for her to go to each of those individual banks and tell them what her business was, what her mother

wanted done, and they would supply her with the necessary documents to be signed and witnessed"; that, after giving this advice, he terminated his first visit with the understanding that he "would return within an hour or so, when her daughter returned from the banks downtown;" and that the transfers were signed when he made his second visit. His explanation of this difference in his testimony at the hearing on the merits was that it was "substantially the same story."

On the point now under consideration, the respondent testified that on Sunday afternoon, when Dr. Myers was not present, her mother told her "You want to attend to those bank books, you have got to attend to those bank books, that money, I want you to have it"; that the following morning she secured the transfer forms from the different banks before she went to the hospital; that when the doctor came and the matter of the bankbooks arose, she gave one of the forms to her mother to read; that her mother asked for her glasses and read it; that when her mother saw that the transfer was made out in their names jointly, she said to her "What did you have my name put on for? I am giving you that money. You don't have to have my name. . . . There was no need. I am going up to your house to live, and I will have enough money from the house in Woonsocket. . . . I am giving you that money." We find no reference to any such occurrence in the testimony of Dr. Myer. Respondent's testimony as to why her mother came to sign the transfer forms by cross is substantially the same as that of the doctor, with the added explanation that she signed in that manner not because she was "so weak", but that "lying down that way you can't write your name very well. I don't think she could."

The respondent further testified that it was she who decided to put the three accounts in the names of her mother and herself; that she thought it would be "nice" in case her mother lived; and that, although the money was given to her, she was willing that her mother "take every cent,

if she got well." Upon being asked if it was not because her mother expected the return of the bankbooks if she recovered, the respondent answered: "No, because she was coming to my house, anyway. She could not be left alone any more." In the evening of that same day respondent wrote a letter to the complainant, who was then in Florida, in which she told him that her mother was "very sick, not expected to live over the day", but made no mention therein of any gift of the bankbooks to her.

The testimony of respondent's husband as to what occured on Saturday afternoon and on Monday morning in reference to the bankbooks adds nothing to what we have hereinbefore stated. The nurse whose name appears as a witness on the transfer forms apparently could not be located by either party. Shortly after the transfer forms were executed as above described, the respondent took them to the respective banks and the accounts were changed as directed that same day, November 17. Thereafter the bankbooks remained in her possession.

We will now turn to the testimony relating to the physical and mental condition of the testatrix between the time of her removal to the hospital and the time of her death, four days later. Without going into details, the respondent in substance testified that, with rare exceptions, her mother's mind was always "keen" and "bright" almost up to the time of her death. Doctor Myers, while not so positive as the respondent, testified substantially to the same effect as to the times when he saw the testatrix. He described her mental condition on Saturday afternoon, before her transfer to the hospital, as "Very sharp, very keen, she knew what it was all about." When he was asked about her condition on Monday morning, November 17, the day when the transfer forms were executed, he answered that her condition then was "amazingly good."

The hospital record in evidence shows that the condition of the testatrix grew progressively worse, with loss of normal physical functions soon after her admission to that

institution. In the history record of the case the following entry appears: "Physical findings: . . . *Mental*: At times, seems in a stupor, then apparently brightens up." The "Progress notes" in this same record are as follows: "11/15/41: Condition on admittance at 6 P. M. fair. Not nearly so good at 9 P. M. In coma. 11/16/41: A little better this morning. 11/17/41: Not so well today. Seems sleepy and drowsy. 11/18/41: Condition not as good. 11/19/41: Condition poor. Expired at 10:40 P. M." These entries are amply supported by specific statements in the "Nurse's Record."

Doctor Auray Fontaine, who qualified as an expert in mental diseases, was called as a witness by the complainant. He did not treat the testatrix or see her at the hospital. He testified that considering the nature of the disease from which she was suffering and taking the hospital record as a whole, which showed the condition of the patient in the various stages of her illness and the character of the treatment which she received, it was his opinion that on Monday, November 17, the patient was in "at least a semi-comatose condition" and that, therefore, she was not able to reason or to realize the character and nature of any act in which she participated.

There is much more evidence of a pertinent character showing respondent's attitude towards her mother's estate and towards the complainant. Generally speaking, after the complainant qualified as executor and while he was in Florida because of the illness of his wife, the respondent dealt with the property of the estate as if it were her own absolute property, disposing of all the household effects and paying hospital and funeral bills. She justified her conduct in this respect by asserting that the complainant had deceived both her and her mother by concealing from them the trust in the will. Such assertion was based merely on alleged statements by the testatrix to the respondent that upon the former's death everything she possessed would belong to the latter.

At the time the three bank accounts in question were changed as herein described, the testatrix owned a three-

family house in Woonsocket, which was free from incumbrance and yielded an estimated income of $1000 a year. She also owned a two-family house in Milton, Massachusetts, where the respondent resided, which was subject to a $4000 mortgage.

After testatrix's death, the respondent transferred all three of the then joint bank accounts. The account in the Old Colony Cooperative Bank, in the sum of $1524.88, was closed and a new account was opened by her in that same bank in the joint names of herself and her husband. The accounts in the other two banks were closed and the amounts thereof, $902.92 and $471.35 respectively, were forwarded at her direction to two banks in Boston. The evidence does not show how the new accounts were opened in those banks.

Upon all the evidence, the trial justice made two findings of fact: First, that when the testatrix executed the three several transfers of the savings bank accounts, she was "in such a mental condition that she did not understand or appreciate the character of the transactions involved"; and, secondly, that when she was in this mental state she was induced by the respondent to affix a cross to each of the several transfers in question.

The instant cause merely concerns an alleged gift *inter vivos* of the three bankbooks to the respondent in her sole absolute right. One who claims the property of another by way of a gift *inter vivos* has the burden of proving such gift by satisfactory evidence. *Old Colony Cooperative Bank* v. *Burger*, 63 R. I. 223; *McGovern* v. *Morin*, 54 R. I. 481. Proof by the donee of donor's sufficient mental capacity to make a gift is essential to the validity of such a gift. See *Union Trust Co.* v. *Davies*, 53 R. I. 63.

The instant cause was tried in the superior court on the theory that the alleged gift to the respondent was made on Monday morning, November 17. The evidence is clearly conflicting as to the mental condition of the testatrix at that time. Cases like the instant cause, where one party to the transaction has deceased, call for the closest scrutiny. This

is especially so here as the alleged gift would deprive the donor of all her money and substantially would defeat a firm and clearly expressed intention in her will. Therefore the credibility of the respondent and her chief supporting witness is of vital importance in this cause.

The trial justice had the advantage of seeing and hearing the witnesses and expressed his view thereon. The evidence on the issue of the mental condition of the testatrix at the time of the alleged gift was in conflict and either one of two reasonable conclusions was possible. The trial justice adopted one of them and decided that at the critical time in question the testatrix did not possess the necessary mental capacity to make a valid gift. There is sufficient evidence in the record before us to support this finding of fact by the trial justice. It is well settled with us that a finding of fact on conflicting evidence by a trial justice will not be disturbed unless clearly wrong. We have carefully examined the evidence and we cannot say that the decision of the trial justice was clearly wrong on the question of the mental capacity of the testatrix at the time of the alleged gift. Since this point is determinative in this cause as tried in the superior court, it becomes unnecessary for us to consider the second finding of fact by the trial justice hereinbefore mentioned.

In the argument before us the respondent also contended, apparently for the first time, that, in any event, there was a completed gift *inter vivos* of the bankbooks at her mother's house on Saturday afternoon, November 15, when there was no question as to her mother having sufficient mental capacity to make a gift. We cannot agree with this contention.

To be effective a gift must be fully executed; it must go into immediate and present effect. A mere intention to make a gift, however clearly expressed, amounts to nothing. In the instant cause, the evidence shows that, on Saturday, the deceased intended to make a gift of the bankbooks to her daughter, but the evidence also shows that, at that same time, acting on the advice of Dr. Myers that she could not give the money to her daughter so easily and that she had to

sign some forms to effectuate such a gift, the deceased postponed completing the gift until the following Monday. In these circumstances, there was no completed gift on Saturday.

The respondents' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Eugene L. Jalbert,* for complainant.

*John J. Mee,* for respondents.