DANIEL I. RHODE AND SALLY RHODE, ET AL., [1] Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent Rhode v. Commissioner
Docket Nos. 29749-85, 21395-87, 23091-87, 23545-87, 28413-87.
United States Tax Court
T.C. Memo 1990-656; 1990 Tax Ct. Memo LEXIS 731; 60 T.C.M. (CCH) 1535; T.C.M. (RIA) 90656; December 31, 1990, Filed *731 Decisions will be entered under Rule 155. Mervin M. Wilf, for the petitioners. John A. Guarnieri and David A. Breen, for the respondent. RUWE, Judge. RUWE
*2190 MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases, respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows: *2191 Addition to Tax
Petitioners
Docket No.
Year(s)
Deficiency
Sec. 6653(a) [2]
Daniel I. Rhode and
29749-85
1980
$ 30,877.00
$ 1,544.00
Sally Rhode
Arthur Abrahams and
21395-87
1980
6,381.00
319.05
Barbara Abrahams
Edgar Hurst and
23091-87
1980
2,060.00
103.00
Sara Jane Hurst
[3] 1981
14,128.70
*  Arthur B. Becker and
23545-87
1980
11,178.00
558.90
Gloria O. Becker
Ellis L. Elgart and
28413-87
1980
[4] *732 16,051.00
802.55
Sivia V. Elgart
Respondent further determined that petitioners are liable for the increased rate of interest, under section 6621(c), for each of their taxable years in issue. [5]
The issues for decision are: (1) Whether petitioners are entitled to charitable *733 contribution deductions under section 170 for donations of various types and quantities of books to qualifying charitable organizations and, if so, the amount of the allowable deduction; (2) whether petitioners are liable for the additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations; and (3) whether petitioners are liable for the increased rate of interest under section 6621(c) for substantial underpayments of tax attributable to tax motivated transactions. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, as supplemented and amended, and attached exhibits are incorporated herein by this reference. At the time they filed their petitions in these consolidated cases, petitioners resided in Pennsylvania. Petitioners filed their joint Federal income tax returns for taxable year 1980 with the Internal Revenue Service Center in Philadelphia, Pennsylvania. All petitioners used the cash receipts and disbursements method of accounting. Unless otherwise indicated, the term "petitioners" shall hereinafter refer collectively to Mr. Rhode, Mr. Abrahams, Mr. Hurst, Mr. Becker, and Mr. Elgart. *734 Publishers Distributors, Incorporated
Mr. Elgart has been a certified public accountant for over 37 years, and is a partner in the accounting firm of Elgart, Dickler and Company, C.P.A.'s (Elgart, Dickler and Company). In 1979, one of Mr. Elgart's clients, Dr. Joe Mendels, informed him of an Internal Revenue Service letter ruling that allowed a taxpayer to claim a charitable contribution deduction for a donation of books to a qualifying charitable organization. Based upon this letter ruling, Mr. Elgart decided that several of his clients might benefit from similarly structured transactions. In July 1979, Mr. Elgart, Dr. Mendels, and Arthur N. Dickler, a partner in Elgart, Dickler and Company, organized a corporation, under the laws of Pennsylvania, called Publishers Distributors Incorporated (PDI). Mr. Elgart held the office of president; Dr. Mendels held the office of vice president; and Mr. Dickler held the office of secretary/treasurer. The outstanding stock of PDI was owned as follows: Mr. Elgart, 37.5 percent; Dr. Mendels, 50 percent; and Mr. Dickler, 12.5 percent. The overall plan was for PDI to purchase books directly from publishers at substantially less than their retail *735 catalog price and resell these books to clients of Elgart, Dickler and Company. PDI's resale price would generally be slightly greater than its purchase price but substantially less than the retail catalog price. The clients would in turn donate these books, one year later, to various qualifying charitable organizations *2192 and claim a charitable contribution deduction in the amount equal to the retail catalog prices of the books donated. Mr. Elgart contacted clients whom he thought would benefit from the charitable contribution deductions. He also contacted several qualifying charitable organizations in order to determine whether they would be interested in the proposed PDI program. In late 1979, PDI entered into separate written agreements giving it an option to purchase "overrun books" and "overrun college texts" from five different publishers. "Overrun" books and texts generally represented the publishers' excess inventory of various titles that the publishers believed could not be sold through the normal market. [6] These publishers were: Ashley Books, Inc. (Ashley Books); the Institute for the Study of Human Issues, Inc. (ISHI); Random House, Inc. (Random House); Raven Press Books, *736 Ltd. (Raven Press); and Viking Penguin, Inc. (Viking Penguin). In the written agreement between Random House and PDI, Random House granted to PDI an option to purchase all of its "Overrun College Texts." The term "overrun college texts" was defined in the agreement as "all college textbooks published by Seller's College Division having catalog prices of $ 13 or more which Seller desires to sell, donate, transfer or otherwise dispose of other than through its normal channels of distribution and other than in the ordinary course and conduct of Sellers business." Under the agreement, Random House was to give PDI written notice setting forth the titles, catalog prices, and quantities of books that were available for purchase by PDI as overrun college texts. In addition, the notice was also to state the purchase price for PDI, which was not to exceed 25 percent or be less than 16 percent of the catalog price of the overrun college texts. After receipt of the notice from Random House, PDI had 90 days *737 in which to exercise its option to purchase the books listed in the notice. Random House was required under the agreement to continue to offer additional copies of titles purchased by PDI for sale through its normal channels of distribution for 12 months after PDI purchased the overrun college texts. If the number of copies of these titles sold by Random House during the ensuing 12-month period was less than 50 percent of the number of copies purchased by PDI, then PDI had the right to either substitute other titles for those that failed to meet this sales quota, or cancel its purchase of those particular titles. The term of the agreement was for 3 years. The agreement was executed by the parties on November 2, 1979. Mr. Elgart signed the agreement on behalf of PDI. Prior to execution of the agreement between Random House and PDI, Random House had provided several lists of college texts that would be available for purchase by PDI as overrun college texts. PDI provided the potential donees with lists of texts which would be available, and the donees indicated which books they would like to receive. Based upon the selections of the donees, PDI selected the books to be purchased. *738 On December 20, 1979, PDI purchased 17,963 overrun college texts for a purchase price of $ 44,955.32, which reflected a cost equal to 16 percent of the existing catalog prices. PDI's purchase consisted of 21 different titles that ranged in quantities of 530 to 1,036 copies per title. Most of the titles purchased by PDI were listed in either Random House's June 1980 and 1981 Books in Print catalogs, or in the 1980 and 1981 Borzoi Books, Alfred A. Knopf, catalogs. [7]
The written agreements that PDI entered into with the other four publishers, Ashley Books, ISHI, Raven Press, and Viking Penguin were generally the same. The agreements were signed by Mr. Elgart on behalf of PDI. In the agreements, each publisher granted to PDI an option to purchase "overrun *739 books," which were defined as: "Overrun Book" or "Overrun Books" shall mean and refer to: (i) all books published by Seller presently being sold by Seller at wholesale for sale at retail to the general public in single copies based upon recommended retail list sales prices established by Seller and published in Seller's present book catalog (the "Catalog Price"); (ii) having a Catalog Price for each book of not less than Five Dollars ($ 5.00) per volume; (iii) which books Seller desires to sell, donate, transfer or otherwise dispose of other than through Seller's normal wholesale channels of sale and distribution and other than in the ordinary course and conduct of Seller's business; and (iv) are books which the Seller agrees will remain in its catalogs and/or its suggested retail price lists for a period of thirteen (13) months following Seller's notice to Buyer pursuant to Paragraph 2.1 hereof at the prices in existence in such catalogs or price lists at the time such notice is given. [8] *740 *2193 Under the agreements with PDI, the publisher was required to send to PDI a list of its overrun books that were available for sale. In this notice, the publisher would grant to PDI a 90-day option to purchase the books listed therein. The purchase price of the overrun books to PDI was not to be less than 16 percent or greater than 20 percent of the catalog prices of the overrun books. [9]
Upon receipt of the lists of available books, PDI provided potential donees with the lists, and the donees indicated which books they wished to receive. Based upon these selections, PDI selected the books to be purchased. After the purchase of overrun books by PDI, the publisher was required to sell additional books of the same titles through its normal channels of distribution during the 12-month period following PDI's purchase. If the number of copies of a title sold by the publisher during the ensuing 12-month period was less than 50 percent of the number of copies of the same title purchased by PDI, then PDI *741 had a right to exchange copies of that title for those of another overrun book. With the exception of Raven Press, the term of the agreement between PDI and each publisher was 5 years. The term of the agreement between PDI and Raven Press was 3 years. The written agreement between PDI and ISHI was executed on October 26, 1979. In December 1979, PDI purchased 4,067 overrun books for a purchase price of $ 13,232.12, which reflected a cost equal to 18 percent of the catalog prices of the overrun books. PDI's purchase consisted of 23 titles that ranged in quantities from 41 to 1,000 copies per title. The overrun books that PDI purchased were scholarly texts published for specialized reading audiences. With the exception of one title, all of the titles purchased were listed in ISHI's Fall-Winter 1979-1980 catalog, and in ISHI's 1981 catalog. [10]
The written agreement between PDI and Viking Penguin was executed on November 16, 1979. On December 13, 1979, PDI purchased 16,826 overrun books from Viking Penguin for *742 a purchase price of $ 19,916.27, which reflected a cost equal to 16 percent of the existing catalog prices. PDI's purchase consisted of 24 different titles from Viking Penguin that ranged in quantities from 472 to 1,218 copies per title. The books purchased by PDI were children's books which are targeted for a reading audience from preschool through high school ages. With the exception of one title, all of the titles that PDI purchased appear to have been listed in Viking Penguin's 1980 and 1981 junior books catalogs. [11]
The written agreement between PDI and Ashley Books was executed on December 13, 1979. PDI purchased 5,434 overrun books for a purchase price of $ 8,281.61, which reflected a cost equal to 16 percent of the catalog prices of the overrun books. PDI's purchase consisted of 66 titles that ranged in quantities from 50 to 583 copies per title. The books purchased were trade books, which are general interest books that are sold through wholesale and retail booksellers that serve libraries and the general public. With the exception *743 of one title, all of the titles purchased by PDI appear to have been listed in either Ashley Books' 1979 or 1981 catalog. [12]
The written agreement between PDI and Raven Press was executed on December 14, 1979. On December 14, 1979, PDI purchased 4,206 overrun books for a purchase price of $ 30,027.30, which reflected a cost equal to 20 percent of the existing catalog prices of the overrun books. [13] *744 PDI's purchase consisted of 41 different titles that ranged in quantities from 47 to 160 copies per title. The overrun books purchased by PDI were medical text and reference books, and were all listed in the 1979 Raven Press catalog. [14]
A summary of the quantity of books, number of titles, the price paid by PDI to each of the five publishers, and the price paid by PDI as a percent of the catalog prices of the books purchased is as follows: *2194 Quantity
Titles
Purchase
Publisher
Purchased
Purchased
Price
Percent *
Random House
17,963
20
$ 44,955.32
16
ISHI
4,067
23
13,232.12
18
Viking Penguin
16,826
24
19,916.27
16
Ashley Books
5,434
66
8,281.61
16
Raven Press
4,206
41
30,027.30
20
Purchases from PDI by Petitioners
During 1979, petitioners Rhode, Abrahams, Hurst, and Becker were clients of Elgart, Dickler and Company, and were contacted by Mr. Elgart about the PDI program. All petitioners purchased books from PDI in late 1979. The books that PDI sold to petitioners Rhode, Abrahams, Hurst, and Becker averaged 27 percent of the catalog prices of the books purchased. Mr. Elgart *745 purchased his books from PDI at PDI's cost of purchasing the books from the publisher. Prior to their participation in the PDI book donation program, Mr. Elgart discussed with the other petitioners the purported favorable tax consequences of purchasing books from PDI and subsequently donating them to qualifying charitable organizations. Petitioners also received from PDI an offering memorandum and a tax opinion letter. Petitioners each read the offering memorandum and tax opinion letter prior to purchasing their respective books. The offering memorandum and tax opinion letter explained that in order to claim a charitable deduction in excess of the cost of the books, the books would have to be considered capital gain property in the hands of the donors and, therefore, the donors would have to hold the books for at least one year. Section 170(e)(1) provided that the amount of any charitable deduction was to be reduced by the amount of gain which would not have been long-term capital gain if the contributed property had been sold by the taxpayer at its fair market value. The offering memorandum also contained the following: It is further anticipated that such Purchasers will claim *746 that the fair market value of the Books donated, at the time of donation, is approximately equal to the then current Catalog Prices for such Books. * * * It must be emphasized that a determination as to a particular Title's fair market value is a purely factual one, and no opinion is expressed with respect to the fair market value of any Titles within a parcel of Books, whether at the time of purchase or at the time of donation. The Corporation cannot and does not in anyway assure that the fair market value claimed by a Purchaser with respect to a specific Title within a parcel will withstand an Internal Revenue Service challenge or audit. * * * Neither Mr. Elgart nor Mr. Dickler has had previous experience in the buying or selling of books. * * * No ruling of the Internal Revenue Service has been obtained or requested with respect to the tax consequences of a purchase of Books, and the opinion of tax counsel is not binding upon the Internal Revenue Service. * * * * * * There can be no assurance that the book publishers' Catalog Prices at the time of donation of the Books will be a conclusive or even a material factor in the ultimate determination of the fair market value of the Books. *747 * * * It must be emphasized that the market which exists for the types of Books composing the parcels is specialized and has been developed by the various book publishers over a period of years at considerable expense. It is highly unlikely that any Purchaser, without the benefit of an established marketing outlet, could market the Books purchased from the Corporation without incurring substantial expenses. Therefore, a prospective Purchaser should not acquire a parcel or parcels of Books based upon an expectation that he could resell such parcel or parcels at a profit. The Corporation will not participate or assist the Purchaser in any way with respect to the marketing or reselling of the Books. The tax opinion letter that PDI furnished to petitioners was prepared by counsel for PDI and contained the following: * * * no assurance can be given that, if the matter is litigated, the Internal Revenue Service would not be successful should it take the position that the value of the books was lower than the list price of the books in the publishers' catalogs. * * * In view of the variety of consequences arising from a charitable contribution of property, * * * each prospective purchaser *748 of books is urged to consult with his own tax advisor as to the particular consequences to such purchaser *2195 of the acquisition and disposition of books * * *.
Petitioners each purchased their books from PDI by executing a separate written Agreement of Sale with PDI. All of the agreements of sale executed between PDI and the respective petitioners were identical. The agreement of sale provided that the individual purchaser was not obligated to donate the books to any particular agency, but rather could dispose of the books in any manner. However, in the event that the contemplated gift was made, the individual petitioner was to transfer title to the donee, f.o.b. the warehouse, and simultaneously make a cash contribution to the donee in order to pay for shipping and handling. The agreement of sale allowed the individual petitioners to exchange any "nonconforming titles" for other books owned by PDI. Nonconforming titles were defined as a book in which the catalog price at the time of purchase had decreased more than 5 percent, or a book that was removed from the current catalog, or a book that failed to sell at retail at the catalog price in quantities at least equal to 50 percent *749 of the total number of books that PDI purchased from the particular publisher. Attached to each agreement of sale was a Bill of Sale that indicated the amount paid by each petitioner and the quantities and titles of each book purchased. Mr. Rhode purchased the following books from PDI: [15]
Quantity
Titles
Catalog
Purchase
Publisher
Purchased
Purchased
Price
Price
Random House
405
20
$  6,259.75
$  1,780.42
ISHI
267
23
6,107.00
1,736.96
Viking Penguin
1,331
24
9,821.80
2,793.55
Ashley Books
3,956
66
37,051.45
10,538.18
Raven Press
117
5
8,265.50
2,350.89
Total
6,076
138
$ 67,505.50
$ 19,200.00
Mr. Abrahams purchased 1,093 books from PDI on December 27, 1979, for a total purchase price of $ 6,400. Of the 1,093 books that Mr. Abrahams purchased, 841 of the books were published by Random House, and 252 of the books were published by Raven Press. The Random House books consisted of 20 titles *750 and the Raven Press books consisted of 33 titles. The combined catalog list price of the books that Mr. Abrahams purchased was $ 22,501.45. Mr. Hurst purchased 1,240 books, consisting of 24 titles, on December 24, 1979, from PDI for a total purchase price of $ 2,200. All the books that Mr. Hurst purchased from PDI were published by Viking Penguin. The total catalog list price of the books was $ 9,106. Mr. Becker purchased 2,867 books, consisting of 7 titles, from PDI on December 18, 1979, for a total price of $ 6,400. All the books that Mr. Becker purchased were published by Viking Penguin. The total catalog list price of the books that Mr. Becker purchased was $ 22,500.65. Mr. Elgart purchased 721 books, consisting of 30 titles, from PDI on December 27, 1979, for a total purchase price of $ 4,000. All of the books that Mr. Elgart purchased from PDI were published by Raven Press. The total catalog list price of the books that Mr. Elgart purchased was $ 22,505.50. Petitioners did not take physical possession of any of the books that they purchased. PDI made arrangements with the publishers and various warehouses for storage of the books for petitioners for a period of 13 months. *751 Petitioners were responsible for the costs of storage. With the exception of the Raven Press and ISHI books, all the books were stored for petitioners in the warehouses of the individual publishers. The Raven Press Books were stored in the International Book Service, Inc. warehouse, and the ISHI books were stored at the Haddon Craftsmen Distribution Center. Donation of Books by Petitioners
In his capacity as president of PDI, Mr. Elgart wrote to the other petitioners on December 5, 1980. He instructed them to mail a letter to their respective charitable donee and to mail another letter to the warehouse where their books were stored. Sample letters were provided with the applicable names and addresses. The sample letter that petitioners were to mail to their respective charitable donee contained the following: I am pleased to advise you that I am contributing, effective December 27, 1980, the following books to aid you in the performance of your service to the community. The schedule enclosed indicates the name of the publisher, *2196 title, quantity, and where the books are presently warehoused. A copy of my letter to the warehouse advising them of the transfer of title to these books *752 to you is enclosed. Warehousing costs are paid until mid-January, 1981. Accordingly, I would suggest that you promptly instruct the warehousing firm where and how you would like these books packaged and shipped. I have enclosed my check for $ as an unrestricted contribution which of course can be used to cover costs of packing and shipping. The sample letter that petitioners were to send to the warehouse or warehouses where their books were stored contained the following: Please be advised that the following books that you are holding for me have been gifted to: * * * effective December 27, 1980. I understand that storage costs are paid for these books until late in January 1981. You should receive packaging and shipping instructions from [Charitable Donee] before that date. They will pay all packaging and shipping charges. Petitioners mailed letters in conformity to the sample letters to their respective donees and to their respective warehouses prior to December 27, 1980. Each petitioner also enclosed checks to cover the costs of packing and shipping. Each of the donees accepted the contributed books and checks in accordance with the letters and the previous arrangements *753 that had been made by Mr. Elgart. On their 1980 joint Federal income tax returns, petitioners each reported that they had made a charitable contribution of the books that they purchased from PDI, in the previous year, to the following organizations: Petitioners
Organization
Daniel I. Rhode and
United Way of Southeastern Pennsylvania
Sally Rhode
Arthur Abrahams and
United Negro College Fund
Barbara Abrahams
Edgar Hurst and
Federation Day Care Services
Sara Jane Hurst
Arthur B. Becker and
The New York Public Library
Gloria O. Becker
Ellis L. Elgart and
United Way of Southeastern Pennsylvania
Sivia V. Elgart The following schedule summarizes petitioners' claimed charitable contribution deductions for the books in question: Claimed Value
Amount of
Petitioners
Cost
of Contribution
Deduction Claimed [16] *754 Daniel I. Rhode and
$ 19,200
$ 67,505
$ 59,726
Sally Rhode
Arthur Abrahams and
6,400
22,500
17,380
Barbara Abrahams
Edgar Hurst and
2,200
9,106
9,106
Sara Jane Hurst
Arthur B. Becker and
6,400
22,615
22,615
Gloria O. Becker
Ellis L. Elgart and
4,000
22,500
22,500
Sivia V. Elgart
Each petitioner in these consolidated cases used the publishers' catalog prices in determining the value of their donations of books. Petitioners' 1980 joint Federal income tax returns were prepared by Elgart, Dickler and Company. Mr. Elgart did not have any experience in book publishing or in book appraisals prior to 1979. None of petitioners in these consolidated cases obtained an independent appraisal of the books that they purchased from PDI. In his statutory notices of deficiency, respondent disallowed the amounts of petitioners' claimed charitable contribution deductions that were attributable to their book donations. *2197 OPINION The first issue for decision is whether petitioners are entitled to charitable contribution deductions for their respective donations of books to the United Way of SoutheasternPennsylvania, the United Negro College Fund, Federation Day Care Services, and The New York Public Library. Deductions are *755 a matter of legislative grace and petitioners bear the burden of proving that they are entitled to any deduction claimed on their returns. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Rule 142(a). Section 170(a) allows a deduction for charitable contributions to any entity described in section 170(c). A contribution is made at the time delivery is effected. Sec. 1.170A-1(b), Income Tax Regs. In determining the existence and timing of a charitable contribution, the analysis applied is the same as the analysis applied in determining the existence and timing of a gift. DeJong v. Commissioner, 36 T.C. 896 (1961), affd. 309 F.2d 373 (9th Cir. 1962). This Court has consistently held that there are six essential elements of a bona fide inter vivos gift. These six elements are: (1) A donor competent to make a gift; (2) a donee capable of accepting a gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that *756 the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual means of commanding dominion of it; and (6) acceptance of the gift by the donee. Guest v. Commissioner, 77 T.C. 9, 15-16, (1981); Weil v. Commissioner, 31 B.T.A. 899, 906 (1934), affd. 82 F.2d 561 (5th Cir. 1936). In these consolidated cases, there is no dispute that the organizations to which petitioners purportedly donated books were qualified charitable organizations as described under section 170(c). Moreover, there is no dispute that the first two elements of an inter vivos gift have been satisfied. Petitioners argue that they made completed gifts of books to the respective charitable donees on December 27, 1980, thereby entitling them to charitable contribution deductions for taxable year 1980. Petitioners claim that they followed Mr. Elgart's instructions and each mailed letters in December 1980, similar to the PDI sample letters. Petitioners argue that these letters manifest their unmistakable intent to make a gift, and are also effective to transfer legal title to the respective charitable donees. Petitioners *757 acknowledge that the books were not physically delivered to the charitable donees during 1980, but argue physical delivery is not necessary where it would be impractical. In making this argument, petitioners contend that the letters that they mailed effected a constructive delivery of the donated books. Respondent agrees that a gift of tangible property can be effected by a writing where manual delivery is not practical. See In re Pyewell's Estate, 334 Pa. 154, 5 A.2d 123 (1939); Mardis v. Steen, 293 Pa. 13, 141 A. 629 (1928). However, respondent argues that petitioners have failed to prove that they sent the letters upon which they rely to establish that completed gifts were made in December 1980. Respondent emphasizes that, with the exception of petitioners Abrahams and Becker, petitioners failed to even produce copies of the letters sent to the donees. Respondent also points out that petitioners failed to produce all of the letters notifying the warehouses where the books were stored. While this evidentiary shortcoming might prove fatal in certain circumstances, we believe that the totality of the evidence in these consolidated cases is sufficient to show that petitioners sent *758 letters in conformance with the PDI sample letters to both the donees and the warehouses in December 1980. The plan to contribute the books was formulated over a year prior to December 27, 1980. Execution of the plan was orchestrated by Mr. Elgart who located publishers who were willing to sell books, ascertained the titles available, located the prospective donees, determined which titles the prospective donees wanted to receive, and obtained a legal opinion on the tax aspects of the plan. Each petitioner invested substantial sums of money in the plan during 1979. In December 1980, Mr. Elgart provided detailed instructions regarding how to effect the gift. All petitioners testified that they followed the December 1980 instructions and sent gift letters to the respective donees and warehouses in December 1980. The donees acknowledged the December 27, 1980, receipt of the gifts. There was evidence that many, if not all, of the books were physically delivered to the donees in 1981. Under these circumstances, we find that petitioners sent letters to the donees and the warehouses pursuant to the instructions which Mr. Elgart sent on December 5, 1980. Respondent argues that even if *759 petitioners have proven that the letters were sent, the letters do not express a present intent to make an immediate gift. Respondent argues that the language used in the letters merely expresses an intention to make a gift in the future and, therefore, does not transfer dominion and control over the books to the charitable donees. As a result, respondent contends that petitioners' *2198 purported gifts were not completed until actual delivery of the books to the charitable donees. Respondent contends that In re Pyewell's Estate, supra, and Mardis v. Steen, supra, are distinguishable from the instant cases, because those cases involved writings which indicate a present intention to pass the right of possession to the donee. Respondent relies on three cases to support his proposition that petitioners' letters did not effect an enforceable transfer of the books to the donees on December 27, 1980. Each case involved whether there had been a completed inter vivos gift prior to the deceased donor's death. In re Estate of Evans, 467 Pa. 336, 356 A.2d 778, 781 (1976), involved a purported inter vivos transfer of the contents of decedent's safe deposit box. The decedent had given physical possession *760 of the safe deposit box keys to the purported donee. However, because the safe deposit box remained registered in the decedent's name, the purported donee could not have gained access to the box even with the keys. The court held that there was no inter vivos gift because decedent "never terminated his control over the box." In re Estate of Evans, 356 A.2d at 782. (Emphasis added.) Chadrow v. Kellman, 378 Pa. 237, 106 A.2d 594, 597 (1954), involved a written joint tenancy agreement whereby the decedent granted a purported donee joint ownership in, and the right to withdraw contents from, a safe deposit box. The agreement was on a form prepared by the bank. However, the decedent never gave the purported donee the key to the safe deposit box. The court held that since the purported donee "never" had access to the box during the decedent's lifetime, there was neither actual nor constructive delivery. Carr v. MacDonald, 70 R.I. 65, 37 A.2d 158 (1944), involved an alleged inter vivos gift of bank accounts by a decedent shortly before her death. The court held that there was no completed gift. It was clear that the decedent expressed an intent to make a gift of the bank accounts, but *761 was advised that she needed to execute certain forms and, therefore, postponed completing the gift at the time, and died prior to effectively completing the gift. None of the three cases relied upon by respondent indicate that a writing, otherwise sufficient to effect a completed gift, is insufficient when the specified effective date is several days after the date upon which the written instrument was executed. Here, it is clear that both the donors and donees intended and believed that the letters to the donees and the custodians of the books, transferred ownership of the books effective December 27, 1980. Under these circumstances, we can see no reason why the gifts should not be considered completed on that date. [17] See Pronzato v. Guerrina, 400 Pa. 521, 163 A.2d 297, 300 (1960); In re Rynier's Estate, 347 Pa. 471, 32 A.2d 736 (1943). We find that the letters which petitioners sent to the donees and the custodians of the books in December 1980, demonstrate a present intention to pass ownership and the right to possession of the books effective December 27, 1980 and that the donees, who had previously selected the book titles that they wished to receive, accepted the books from *762 petitioners pursuant to the terms contained in petitioners' letters. If a charitable contribution is made in property other than money, the amount of the allowable deduction is the fair market value of the property at the time of the contribution, reduced as provided in section 170(e)(1). Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as "the price at which the property would change hands between *763 a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2). The determination of fair market value of an item of property is a question of fact. Goldstein v. Commissioner, 89 T.C. 535, 544 (1987); Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Petitioners bear the burden of proving the fair market value of their donated books. Rule 142(a). Section 170 and the regulations promulgated thereunder are silent as to the market to be used in determining the value of donated property. It has been recognized that the valuation test for charitable contribution deduction purposes is generally the same as that used for estate and gift tax purposes. United States v. Parker, 376 F.2d 402, 408 (5th Cir. 1967); Anselmo v. Commissioner, 80 T.C. 872, 881-884 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The test for estate and gift tax valuation, under the regulations, provides that the fair market value of an item of property is to be determined in the market where such items are "most commonly sold to *764 the public." Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. In the *2199 normal situation, a sale "to the public" refers to a sale to the "retail customer who is the ultimate consumer of the property." Anselmo v. Commissioner, supra at 882. In Lio v. Commissioner, 85 T.C. 56, 70 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987), we stated that the sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale. See Goldman v. Commissioner, 388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966). The appropriate market is determined from the facts and circumstances of each particular case. Lio v. Commissioner, supra.After identifying the appropriate market, fair market value is determined by the amount that consumers would pay, in this market, for the items in question on the date of contribution. Goldstein v. Commissioner, supra; Lio v. Commissioner, supra.
Petitioners argue that the appropriate market for determining the fair market value of their donated books is the retail market where the consumer purchases books at catalog prices. Petitioners rely upon our decision in Skripak v. Commissioner, supra, *765 in which we were required to value scholarly reprint books. In Skripak, the taxpayers participated in a book contribution program whereby they purchased scholarly reprint books from Reprints, Inc. (RPI), and subsequently donated the books to various small rural public libraries. RPI purchased the books from BFL Communications, Inc. (BFL). The taxpayers each claimed a charitable contribution deduction for their donation of books which was approximately three times the amount they paid to purchase the books. We found that the appropriate market was the "retail market place, comprised largely of institutional buyers (libraries) and, to a minor extent, of individuals seeking a specific scholarly text." Skripak v. Commissioner, supra at 322. We rejected, however, the taxpayers' argument that the fair market value of the books donated was equal to the catalog retail list prices of the books. Petitioners have distinguished Skripak by contending that the titles of books that they contributed to the respective charitable organizations were sold in substantial quantities to other consumers during the years 1980 through 1987. Thus, unlike Skripak where we found that there were no substantial *766 sales by BFL to other consumers, petitioners argue that the fair market value of the books in question here is their catalog prices. In Skripak, however, we also found the taxpayers' method of valuation flawed because their method ignored the fact that the reprint books represented BFL's excess inventory, under which circumstance the ultimate consumer would have received a substantial discount. In addition, the taxpayers also failed to consider the weakness of the reprint book market. Skripak v. Commissioner, supra at 325-326. We also noted that, even if we had accepted BFL's catalog list price at face value, the sheer number of books to be valued for each taxpayer would have required a substantial discount from that price. Skripak v. Commissioner, supra at 325. Petitioners have relied upon expert witnesses to establish that the book titles contributed by petitioners would have sold at their catalog prices in the retail market place during 1980. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Barry v. United States, 501 F.2d 578, 583 (6th Cir. 1974); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject *767 expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. It is unrealistic to suggest that the catalog retail list prices accurately measure the fair market value of the books donated by petitioners. The PDI offering memorandum itself cautioned petitioners that it was "highly unlikely" that they could resell the books at catalog prices, and that they should not purchase the books with the expectation of being able to resell them at a profit. In most cases, the publishers determined that the book titles sold to PDI were overstocked and could not be sold through normal channels. In the case of ISHI books, the publisher thought the books could be sold, but only over a long period of time of ten or more years. In lieu of waiting for many years to possibly sell all of the ISHI books, the publisher decided to sell to PDI to realize immediate cash. The present value of the ISHI books would, of course, be affected by the inability to sell them for many years. Respondent's expert witnesses valued some of the books based *768 upon a hypothetical sale to a consumer in the "remainder" market. [18] However, there is no evidence in the record before us indicating that the titles that were donated were sold in the remainder market. In most instances, it appears that the publishers were trying to *2200 avoid the sale of these particular titles in the remainder market. Respondent's experts determined that some of the books should be valued at what petitioners paid for them and, in some instances, opined that certain books had little or no value at all. We find that neither the remainder market nor the retail market, where books are sold at catalog list prices, is the appropriate market in which to determine the fair market value of the "overrun" books and college texts which petitioners donated. We conclude that the ultimate consumers *769 of the books in issue were those persons who purchased books from PDI. It is clear from the evidence in the record before us that petitioners purchased books from PDI for the purpose of making subsequent donations to charitable organizations. The publishers and, in turn, PDI sold the books with the understanding that petitioners intended to donate the books to charitable organizations. Petitioners claim to have donated their books to a qualified charitable organization during taxable year 1980. Under these circumstances, it is clear that petitioners did not purchase books from PDI for resale. Petitioners were, therefore, the ultimate consumers of the PDI books. Lio v. Commissioner, 85 T.C. at 68-69. Thus, the appropriate market for determining the value of the "overrun" books and college texts is the market which was created by PDI. See Hunter v. Commissioner, T.C. Memo. 1986-308. The most probative evidence of the fair market value of the donated books is the amount petitioners paid for them, especially since petitioners acquired their books only one year prior to the time of contribution. Goldstein v. Commissioner, 89 T.C. at 546; Chiu v. Commissioner, supra; Lio v. Commissioner, supra. *770 Petitioners do not argue that any appreciation in value occurred from the date of acquisition to the date of contribution, and we do not believe that any appreciation in value did occur. We find that the fair market value of the donated books, therefore, is the same as the amount each petitioner paid for them when they were purchased from PDI. Additions to Tax and Increased Interest
The next issue for decision is whether petitioners are liable for the additions to tax under section 6653(a), as determined by respondent. Section 6653(a) imposes an addition to tax, in an amount equal to 5 percent of the underpayment, if any part of any underpayment is due to negligence or intentional disregard of rules and regulations. Respondent's determination is presumed correct and petitioners bear the burden of proving otherwise. Bixby v. Commissioner , 58 T.C. 757, 791-792 (1972); Rule 142(a). Negligence within the meaning of section 6653(a) has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners Rhode, Hurst, Abrahams, and Becker, argue that they are not liable for the *771 addition to tax for negligence or intentional disregard of rules and regulations because they relied in good faith upon the advice of Mr. Elgart. They argue that Mr. Elgart was conversant with Federal income tax law and carefully researched and planned the PDI book contribution program. In some circumstances, a taxpayer may not be liable for the addition to tax for negligence or intentional disregard of rules and regulations if he relied in good faith, albeit erroneously, upon the advice of a tax expert. Ewing v. Commissioner, 91 T.C. 396, 423 (1988); Nelson v. Commissioner, 19 T.C. 575, 581 (1952). Under the circumstances of these consolidated cases, however, we do not find that petitioners Rhode's, Hurst's, Abrahams', and Becker's reliance upon the tax advice of Mr. Elgart is sufficient to carry their burden of proof. The offering memorandum given to petitioners "emphasized that a determination as to a particular Title's fair market value is a purely factual one, and no opinion is expressed with respect to the fair market value" (emphasis added) of the books, and that "Neither Mr. Elgart nor Mr. Dickler has had previous experience in the buying or selling of books." It went on *772 to caution that catalog prices might not be conclusive "or even a material factor in the ultimate determination of the fair market value of the Books" and that petitioners could not reasonably expect to resell the books at a profit. Each petitioner in these consolidated cases received and read the offering memorandum that warned that the fair market value of the books may not be equal to their respective catalog prices at the time of donation. None of petitioners, including Mr. Elgart, obtained an independent appraisal of the books that they had purchased despite being fully aware of the fact that there were serious questions about their valuation method. Under the circumstances of these consolidated cases, we find that petitioners failed to prove that their action conformed to what a reasonable and ordinarily prudent person would do under the circumstances. See Goldstein v. Commissioner, 89 T.C. at 550; Weintrob v. Commissioner, T.C. Memo. 1990-513. Accordingly, we find petitioners liable for the additions to tax under section 6653(a) as determined by respondent. The final issue for decision is whether petitioners are liable for the increased rate of interest *2201 under section 6621(c). *773 Section 6621(c) provides that with respect to interest payable under section 6601, an increased rate of interest is imposed when there is a "substantial underpayment" (exceeds $ 1,000) "attributable to one or more tax motivated transactions." The additional interest accrues after December 31, 1984, even though the transaction was entered into prior to the enactment of section 6621(c). DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988); Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). A "tax motivated transaction" includes "any valuation overstatement" as defined in section 6659(c). Sec. 6621(c)(3). Under section 6659(c), a valuation overstatement is present if the value of any property claimed on a return is 150 percent or more of the amount determined to be the correct valuation of such property. We have found that petitioners overstated the value of their donated books by more than 150 percent of the amount determined to be the correct valuation. We, therefore, find that each of the petitioners is liable for the increased rate of interest for taxable year 1980 to the *774 extent that the underpayments attributable to the tax motivated transaction exceed $ 1,000. This will have to be determined pursuant to the Rule 155 computation. Decisions will be entered under Rule 155. Footnotes
1. The cases of the following petitioners are consolidated herewith: Arthur Abrahams and Barbara Abrahams, docket No. 21395-87; Edgar Hurst and Sara Jane Hurst, docket No. 23091-87; Arthur B. Becker and Gloria O. Becker, docket No. 23545-87; and Ellis L. Elgart and Sivia V. Elgart, docket No. 28413-87.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Petitioners Edgar Hurst and Sara Jane Hurst have conceded the entire amount of deficiency and respondent has conceded the addition to tax, under section 6653(a)(1) and (2)↩, for taxable year 1981. *. Section 6653(a) was amended by the Economic Recovery Tax Act of 1981 (ERTA), and divided into section 6653(a)(1) and (2) applicable to taxes the last date prescribed for payment of which is after December 31, 1981. Pub. L. 97-34, sec. 722(b)(1), 95 Stat. 342-343. Accordingly, respondent determined the additions to tax for the Hursts' 1981 taxable year, under section 6653(a)(1) in the amount of $ 706.44, and under section 6653(a)(2)↩ in the amount of 50 percent of the interest due on $ 14,128.70.
4. Respondent incorrectly computed the amount of the deficiency for the Elgarts' 1980 taxable year. The parties have agreed to prepare a Rule 155 computation for the Court's consideration in entering a decision in docket No. 28413-87.
5. Former section 6621(d) was redesignated as section 6621(c)↩ pursuant to section 1511(c), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. Respondent has conceded that petitioners Edgar Hurst and Sara Jane Hurst are not liable for the increased rate of interest for taxable year 1981.
6. In the case of the Institute for the Study of Human Issues, Inc. (ISHI), the publisher believed the "overrun books" could be sold, but only over a long period of time of ten or more years.↩
7. Alfred A. Knopf books are distributed by Random House. Based upon the title codes of the books purchased by PDI, the following titles do not appear to have been listed in either catalog in 1980 or 1981: "American Political System"; "LT Psychology"; "Modern Marketing"; "Social Problems"; "Understanding Psychology"; and "U.S. to 1877." The titles, "Anthropology, 2 ed." and "General Anthropology" were listed only in the 1980 catalogs.↩
8. In the agreement between Raven Press and PDI, the catalog price was not to be less than $ 15.00 per book. In addition, Raven Press did not agree that overrun books would remain in its catalog for a period of 13 months after notice was given to PDI.
9. In the agreement between Raven Press and PDI, the purchase price to PDI of the overrun books was a flat 20 percent of the catalog price.↩
10. The evidence in the record does not show that the title "From Field to Factory: Community Structure and Industrialization in West Bengal" was listed in ISHI's 1981 catalog.↩
11. The evidence in the record does not show that the title "Walk Rabbit Walk" was listed in the Viking Penguin 1981 junior books catalog.↩
12. The evidence in the record does not show that the title "The Little Red Schoolhouse" was listed in either catalog. Ashley Books' 1980 catalog was not offered into evidence.↩
13. Jt. Ex. 46-AT reflects 4,106 books purchased by PDI. This exhibit does not reflect, however, the purchase of 100 copies of "Progress Chemical Fibrinolysis, Vol. 3" as indicated on the invoice found at Jt. Ex. 36-AJ. Moreover, Jt. Ex. 146-EP shows this book as being donated by petitioners, Elgart, Rhode, and Abrahams and other participants in the PDI program. This exhibit indicates, however, that PDI purchased 4,234 books from Raven Press. Though all parties have stipulated to these exhibits, the only invoice from Raven Press entered into evidence shows that 4,206 books were purchased.
14. Catalogs from Raven Press for 1980 and 1981 were not introduced into evidence.↩
*. Represents the price paid by PDI as a percent of the catalog prices of the books purchased.↩
15. We note that the Agreement of Sale between Mr. Rhode and PDI was executed before the date when PDI purchased the books from the five different publishers. When PDI purchased the books from the five publishers, Mr. Rhode acquired title to the books that he purchased from PDI at that time. See McKee v. Ward, 289 Pa. 414, 137 A. 599↩ (1927).
16. The lesser deductions claimed by petitioners Rhode and Abrahams reflect the 30 percent limitation of section 170(b)(1)(C)(i) on contributions of certain capital gain property. Petitioners Rhode and Abrahams designated on their respective 1980 joint Federal income tax returns the unused portions of their claimed contribution of books of $ 7,779 and $ 5,120, respectively, as a carryover into subsequent taxable years.
17. The question of whether or not petitioners could have revoked the gifts between the date the letters were mailed and December 27, 1980 is not before us. The fact is that no such revocation was attempted and, on December 27, 1980, both the donors and donees intended and believed that ownership of the books passed to the donees pursuant to petitioners' long-standing plan. The policy behind the requirement that a gift be completed by delivery is to avoid a mistake and to protect alleged donors from fraudulent claims. Where the donor and the donee both acknowledge the gift, and no third party is involved in the transaction, the reason for actual delivery is absent. Hengst v. Hengst, 491 Pa. 120, 420 A.2d 370, 371 (1980); see Sandler v. Commissioner, T.C. Memo. 1986-451↩.
18. Generally, a title is "remaindered" when it is no longer profitable for the publisher to keep that particular title in print. The publisher will sell its remaining inventory of the title to a wholesaler who will subsequently offer the books to retail outlets at a new recommended "sale" price. The new "sale" price ranges from 10 to 40 percent of the original publisher's catalog price.↩